## COMMONWEALTH *vs.* RICKY D. MCGEE.

Suffolk. October 11, 2013. - February 12, 2014.

Present: IRELAND, C.J., CORDY, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial, Discovery, Instructions to jury, Request for jury instructions. *Evidence,* Exculpatory, Ballistician's certificate, Prior misconduct, Credibility of witness, Relevancy and materiality, Photograph. *Witness,* Intimidation, Credibility. *Intimidation of Witness. Firearms.*

A Superior Court judge did not abuse her discretion in denying the defendant's motions for a new trial on indictments charging, inter alia, murder in the first degree on theories of deliberate premeditation and felony-murder, where there was no substantial risk that a jury would reach a different conclusion if presented with the testimony that had been expected from a friend of the defendant (who instead asserted his right under the Fifth Amendment to the United States Constitution not to testify against himself), even if that testimony were considered "newly available" evidence, in that the proffered testimony was cumulative of testimony given at trial, focused on a fact that was not a live issue at trial, and could have been used only to impeach a witness who testified [145-150]; and where, likewise, there was no substantial risk that a jury would reach a different conclusion if presented with testimony from the defendant's mother (who also asserted her Fifth Amendment privilege not to testify), even if that testimony were considered "newly available" evidence, in that the proffered new evidence would have been available only to impeach a witness who testified at trial or to provide cumulative evidence of that witness's motive to fabricate her testimony regarding the defendant's role in the robbery and shooting [150-151].

A Superior Court judge did not abuse her discretion in denying the defendant's motions for a new trial on indictments charging, inter alia, murder in the first degree on theories of deliberate premeditation and felony-murder, where, even assuming that a police officer had intimidated a friend of the defendant such that the friend decided not to testify, the defendant failed to show prejudice due to the absence of the friend's testimony. [151-152]

A Superior Court judge did not abuse her discretion in denying the defendant's motions for a new trial on indictments charging, inter alia, murder in the first degree on theories of deliberate premeditation and felony-murder, where the judge did not err in admitting in evidence testimony from an expert witness that a gun shown in a photograph was consistent with a class of guns that could have produced a bullet fragment extracted from the victim's body. [152-154]

At a murder trial, the judge did not err in denying the defendant's request for an instruction regarding testimony by a witness for the Commonwealth,

where the judge's general instructions adequately conveyed to the jury how they were to evaluate witness credibility, particularly in light of the fact that defense counsel vigorously cross-examined the witness and vigorously argued to the jury her lack of credibility. [154-155]

At a murder trial, the judge did not abuse her discretion in admitting evidence (in the form of a photograph of a man standing in the defendant's bedroom holding a gun that was of the class of guns capable of discharging bullets that could have produced the fragments extracted from the victim's body, as well as testimony concerning a gun that the witness saw in the defendant's possession on the night of the shooting and earlier) that the defendant had possessed a weapon on a prior occasion, as such evidence was relevant as a link in tending to prove that the defendant committed the crime charged, and the probative value of such evidence outweighed the risk that the jury might use it as improper character or propensity evidence [155-157]; further, although the judge did not give a limiting instruction at the time of the introduction of the photograph as to the proper use of evidence that the man in the photograph was also holding a gun that could not have been used to commit the crime, and her instruction in her final charge did not adequately instruct the jury on this point, no substantial likelihood of a miscarriage of justice arose, where the evidence of the second gun received only scant attention at trial [157-159].

INDICTMENTS found and returned in the Superior Court Department on July 25, 1997.

The cases were tried before *Regina L. Quinlan,* J., and motions for a new trial, filed on November 10, 1998, and April 14, 2011, were heard by her.

*David A.F. Lewis* for the defendant.

*Amanda Teo,* Assistant District Attorney, for the Commonwealth.

DUFFLY, J. On October 20, 1998, a Superior Court jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and felony-murder, G. L. c. 265, § 1, in the shooting death of Getasetegn Yalew.[1] The defendant's appeal from his convictions and his appeal from the denial of his first motion for a new trial were stayed pending determination of his second motion for a new trial; that motion was denied, as was the defendant's motion for reconsideration and his request for posttrial discovery. These appeals were consolidated and are now before us.

---

[1] The jury also convicted the defendant of armed robbery, G. L. c. 265, § 17, and illegal possession of a firearm, G. L. c. 269, § 10 (*a*).

The defendant argues that his new trial motions should have been allowed because of newly discovered evidence, and that it was an abuse of discretion to deny his requests for posttrial discovery. The defendant maintains further that the trial judge erred in failing to give a specific instruction on witness credibility, and made errors in certain evidentiary rulings. He also seeks relief pursuant to G. L. c. 278, § 33E. We conclude that none of the defendant's claims of error requires reversal, and find no basis to exercise our authority pursuant to G. L. c. 278, § 33E, to order a new trial. Accordingly, we affirm the defendant's convictions.[2]

*Facts.* We recite the facts the jury could have found, reserving mention of certain facts for our discussion of the issues. Sometime between 2:16 A.M. and 2:40 A.M. on April 16, 1997, the victim, a store clerk at a convenience store in the Fenway section of Boston, was shot in the back of the head with a .38 caliber revolver. The victim, who was still alive at that point, was discovered by one of his friends, who telephoned 911; the victim died later that day as a result of the gunshot wound. The robber took food stamps, a cash tray that held less than ninety-four dollars in cash, and a coin compartment from the cash register. A few hours after the robbery, police found the cash tray, a single leather glove, and a coin in an alley located next to the convenience store that leads to a parking area behind some apartment buildings. The glove and coin were found on a ledge at the edge of the parking lot; four to five feet below that ledge is another parking lot from which a small alleyway, not immediately visible, leads to a public street. Also that day, the owner of a truck that had been parked in the lot near the alleyway found a coin compartment in the truck bed and contacted police.

The defendant lived with his mother, her three other children, and a family friend, Natasha Hamilton, in an apartment a few blocks from the convenience store.[3] Testimony at trial indicated

---

[2]Because the defendant was convicted of murder on theories of both deliberate premeditation and felony murder, the judgment on the indictment charging armed robbery is not duplicative. See *Commonwealth* v. *Bizanowicz*, 459 Mass. 400, 402 (2011), citing *Commonwealth* v. *Felder*, 455 Mass. 359, 370 371 (2009).

[3]Natasha Hamilton's children also had lived in the apartment, but at the time of the robbery, they were living elsewhere.

that only a person familiar with the area would know that the defendant's apartment building could be reached by proceeding from the convenience store down the alley to the parking lot and from there through the small alleyway to the street.

At about 1:45 A.M. on April 16, the defendant, his mother, and Hamilton returned to the apartment from a pizza shop. The defendant's mother went to bed, but Hamilton stayed up to watch television. At about 2:00 A.M., Hamilton saw the defendant leave the apartment wearing a black "skully" cap on his head, a ski mask around his neck, a black pullover, dark fatigue pants, and black boots; he also carried dark brown, almost black gloves in his pocket. When he returned approximately fifteen to twenty minutes later, the defendant was wearing only one glove. The defendant appeared to Hamilton to be nervous; his face was sweating and his voice seemed "scared." He told Hamilton that he had "shot the man" who worked at the convenience store, describing him as "the short guy with the curly hair" who is "always smiling." The defendant said he had gone to the convenience store to rob it and had told the clerk to lie down on the floor; when the man reached for something, the defendant shot him in the back of his head. Hamilton observed the defendant take money and food stamps from his pocket and sort them into two piles on a coffee table; the defendant also put some coins on the table. The defendant then pulled a black gun from his waist, and emptied the bullets from it.

The defendant changed his clothes and told Hamilton he wanted to get cigarettes at a different convenience store. She agreed to accompany him. The defendant wondered aloud whether the victim was alive and had been found; he said he wanted to retrieve the security tape from the convenience store and to find the glove he had dropped at some point after leaving the store. The defendant told Hamilton he had returned to the apartment using the alley near the store and that he had tossed the cash drawer as he ran down the alley. While en route to get cigarettes, Hamilton and the defendant walked past the convenience store. When they saw no police or other activity, the defendant said "Damn, no one found him yet." On the way home, they again passed the store and still observed no police or ambulance. By the time they reached their apartment building, Hamilton could hear sirens.

Later that day, as he was leaving the apartment with Earrie Fenderson, a childhood friend, the defendant lifted his shirt and displayed the gun Hamilton had seen him handle earlier that morning, saying he was taking the gun to the Mission Hill section of Boston. The defendant told Fenderson that he had robbed the store of a small amount of money that was in the register, but that it was not enough and he had wanted the cash in the safe. He shot the clerk because he thought the clerk was lying when he said he did not know the combination to the safe.

The store's security cameras were not functioning on the night of the robbery, and the only physical evidence recovered from the crime scene was two bullet fragments.[4] Hamilton was aware that the store had offered a $25,000 reward for information leading to apprehension and conviction of the shooter. The defendant was arrested almost three months later, when Hamilton informed police that, on the evening of the shooting, the defendant had confessed to her. At the time of the arrest, police seized from the defendant's bedroom a photograph of Fenderson, holding a silver gun in one hand and a black revolver in the other, and a .38 caliber spent shell casing indicating that the bullet had been discharged.

*Discussion.* Because the defendant's appeals from the denials of his two new trial motions have been consolidated with his direct appeal, we review all three pursuant to G. L. c. 278, § 33E. *Commonwealth* v. *Mercado*, 466 Mass. 141, 145 (2013), quoting *Commonwealth* v. *Alicea*, 464 Mass. 837, 840 (2013).

1. *Motion for new trial.* The primary issue at trial was whether the defendant was the individual who had committed the robbery and shot the victim. As there was no physical evidence tying the defendant to the crime scene, the Commonwealth's case was largely dependent on the testimony of Hamilton and Fenderson, who testified to statements made to them by the defendant. The defendant elicited evidence that each of these witnesses had a motive to lie, and that details of the crime that

---

[4]A police ballistics expert testified to his opinion that, based on the absence of a shell casing at the scene, a revolver was used in the shooting because, in a working revolver, the shell casings will stay inside the gun. In contrast, when a bullet is discharged from an automatic or semiautomatic gun, the empty shell casing is "thrown up" from the gun.

they said had been provided by the defendant could have been obtained from news coverage. On appeal, the defendant does not contest the sufficiency of the evidence at trial. Rather, he contends that the motion judge, who was also the trial judge, abused her discretion in denying his first and second motions for a new trial based on his assertions that newly discovered evidence calls into question the trial testimony of two of the Commonwealth's witnesses, Hamilton and Fenderson, and warrants a new trial.

We review a judge's denial of a motion for a new trial "only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Robideau*, 464 Mass. 699, 701-702 (2013), quoting *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). We discuss in turn the claims regarding each of the three witnesses, as well as other evidence the defendant maintains is newly discovered.

a. *Testimony of Randy Farrell.* The defendant's friend, Randy Farrell, was subpoenaed by the defendant and had been expected to testify at trial regarding the ownership of the guns depicted in the photograph of Fenderson seized from the defendant's bedroom; the photograph had been taken in the defendant's bedroom, when Farrell was present, about four months before the shooting. Farrell was expected to testify that the silver gun in Fenderson's right hand belonged to Farrell and the black revolver in Fenderson's left hand belonged to Fenderson. Farrell was expected to say that Fenderson arrived at the defendant's apartment after Farrell got there, bringing with him the black gun shown in the photograph, and took the gun with him when he left. Farrell initially had agreed to testify for the defendant notwithstanding his statement to defense counsel that he knew he risked criminal prosecution if he admitted that he owned one of the guns. However, after encountering a police detective in the court house while he was awaiting his turn to testify, Farrell asserted his rights under the Fifth Amendment to the United States Constitution.

The defendant maintained, in his first motion for a new trial, that Farrell's invocation of his Fifth Amendment privilege against self-incrimination was the result of intimidation and threats made by Sergeant Detective Daniel Keeler of the Boston police

department homicide unit. Farrell was a potential witness in a pending homicide case in which Keeler was an investigator. In his memorandum in support of his first motion for a new trial, the defendant argued that Keeler told Farrell that "if he admitted possession of a handgun he would be prosecuted, and that he should 'take the [F]ifth.' "[5]

Following the evidentiary hearing, the judge concluded that Farrell's encounter with Keeler was unplanned, and that Farrell had not been intimidated or threatened by Keeler. Farrell knew Keeler from another case in which Farrell planned to testify concerning the ownership of a gun. Farrell had requested an attorney prior to testifying, based on Keeler's statement to him that the defendant's counsel represented only the defendant and that Farrell should have his own attorney. Farrell then approached defense counsel, who relayed the request for an attorney to the court, and an attorney was appointed; after meeting with the attorney, Farrell asserted his Fifth Amendment right not to testify. The judge found also that Farrell had agreed to testify at trial that he owned the silver gun Fenderson was photographed holding while in the defendant's bedroom, and that Fenderson was the owner of the black gun.[6]

On appeal, the defendant argues that testimony that was "unavailable" at trial as a consequence of a witness's assertion of a Fifth Amendment privilege is newly discovered evidence if it becomes available thereafter. He asserts that Farrell's posttrial testimony that the black revolver that Fenderson is holding in the photograph belonged to Fenderson, and not to the defendant, became available for the first time when Farrell agreed to waive his Fifth Amendment right not to testify, and that this newly available evidence is critical because it directly challenges the account of one of the Commonwealth's primary witnesses against him.

Although we have not recognized a distinct category of "newly

---

[5]After conferring with counsel regarding waiver of his Fifth Amendment privilege, Farrell testified at an evidentiary hearing on the defendant's motion for a new trial. Farrell said he understood Keeler's statements about Farrell's potential testimony and the need to obtain an attorney to mean that, if he testified, Keeler "was going to be pressuring me" and "more than likely I'd be charged with the gun in the picture."

[6]Farrell testified at the hearing that the black gun was a revolver.

available" evidence, and therefore review this claim under the framework that we apply to "newly discovered" evidence, see *Commonwealth* v. *Evans*, 439 Mass. 184, 203, cert. denied, 540 U.S. 923, and 540 U.S. 973 (2003), and *Commonwealth* v. *Cintron*, 435 Mass. 509, 516 (2001), overruled on other grounds by *Commonwealth* v. *Hart*, 455 Mass. 230 (2009), these decisions suggest that evidence that was not available at trial because a witness asserted a Fifth Amendment privilege, but thereafter became available, properly can provide the basis for a decision to grant a new trial.

There is some tension in our decisional law, however, regarding the considerations a judge must undertake in deciding whether to grant a new trial based on the testimony of a witness who had previously asserted a Fifth Amendment privilege. In *Commonwealth* v. *Cintron*, *supra* at 518, we referred to such testimony as "newly available," and proceeded directly to the question whether it presented "a substantial risk that a jury would arrive at a different result after hearing the new evidence." We held that no such risk existed because the testimony was not credible and would have been cumulative of already admitted evidence. *Id.* In other decisions, however, we have stated that exculpatory statements of a witness who previously had invoked his or her Fifth Amendment privilege do not constitute "newly discovered" or "newly available" evidence where a defendant was aware of the content of the statements at the time of trial. See *Commonwealth* v. *Evans*, 439 Mass. at 203; *Commonwealth* v. *Wolinski*, 431 Mass. 228, 237 (2000).

Here, the defendant was aware of the content of Farrell's potentially exculpatory testimony before trial, namely that Fenderson owned the black gun, arrived with it after Farrell arrived at the defendant's apartment on the day the photograph of Fenderson was taken, and left with the gun in his possession. As the defendant acknowledged in his memorandum in support of his first motion for a new trial, "[d]uring pre-trial preparations, Farrell revealed to defense counsel . . . that the black revolver belonged to Earrie Fenderson, that Fenderson had the gun in his waistband when Farrell arrived at the [d]efendant's apartment, and that Fenderson left the [d]efendant's apartment in possession of the revolver."

Even were we to conclude that Farrell's expected testimony is "newly available" evidence, the testimony would not "cast[] real doubt on the justice of the conviction," *Commonwealth* v. *Grace*, 397 Mass. at 305, as there was no "substantial risk that a jury would reach a different conclusion if presented with the newly available evidence." *Commonwealth* v. *Cintron*, 435 Mass. at 516. Had Farrell testified at trial in accordance with his testimony at the evidentiary hearing, the prosecutor likely would have elicited from Farrell, as she did at the hearing, that Fenderson was already at the defendant's house when Farrell arrived, that Farrell saw Fenderson with a black revolver, that Farrell left while Fenderson was still in the apartment, and that Farrell did not know if "Fenderson brought that gun [with him] or if that gun was already at [the defendant's] house." In this respect, Farrell's testimony would have been cumulative of the trial testimony of Emerson Ocampo, another of the defendant's friends, who testified that he was present the day that Fenderson posed for the photograph holding a silver automatic in one hand and a black revolver in the other, that the guns were already in the defendant's bedroom when Ocampo arrived, and that he did not see anyone take the guns out of the room. Cumulative evidence "carries less weight than new evidence different in kind." *Commonwealth* v. *Cintron*, 435 Mass. at 518, quoting *Commonwealth* v. *Scanlon*, 412 Mass. 664, 680 (1992).

Furthermore, ownership of the guns in the photograph was not a live issue at trial. Rather, the photograph of Fenderson holding the guns was introduced to show that the defendant had access to guns, and that he could have used the black gun in the photograph during the robbery. As such, the evidence corroborated trial testimony that the defendant had been seen with a gun in the weeks and months prior to the shooting,[7] and supported the Commonwealth's argument that the defendant had access to such guns.

---

[7]Emerson Ocampo further testified that, on the day the photograph of Henderson holding the guns was taken, the defendant was in the room and "mostly likely everybody [in the room] touched" the guns. Hamilton testified, without objection, that, prior to the night of the shooting, she had seen the same gun in the defendant's room, and had observed the defendant put the gun under a sofa cushion. Fenderson testified, also without objection, that he had posed for a photograph while in the defendant's bedroom some months prior to the shooting, holding two guns; that one of the guns was a .38 caliber

That Farrell's testimony could have been used to impeach Fenderson, who testified at trial that he did not know who owned the black revolver he was shown holding in the photograph taken a few months prior to the shooting, also does not avail the defendant. "Newly discovered evidence that tends merely to impeach the testimony of a witness does not ordinarily warrant a new trial." *Commonwealth* v. *Simmons*, 417 Mass. 60, 72 (1994).

b. *Testimony of defendant's mother.* The judge appointed counsel to represent Marion McGee,[8] the defendant's mother, in connection with her anticipated testimony; after speaking with counsel, Marion asserted her Fifth Amendment privilege not to testify. The judge denied defense counsel's request that Marion be granted immunity as to questions regarding the indorsement of certain financial dealings by Hamilton involving Marion's bank account, or to exclude questions concerning those matters,[9] and Marion was not called as a witness.

In both of his motions for a new trial, the defendant maintained that Marion's testimony was "unavailable" at trial because she invoked her Fifth Amendment privilege not to testify, and that because it is now newly available, he is entitled to a new trial. Even assuming that the testimony were newly available, there was no "substantial risk that a jury would reach a different conclusion if presented with the newly available evidence." *Commonwealth* v. *Cintron*, 435 Mass. at 516. Much of the proffered new evidence would have been available only to impeach

revolver that he had, prior to the day the photograph was taken, seen in the defendant's room; and that he did not know whose gun the revolver was.

[8]Because they share a last name, we refer to the defendant's mother, Marion McGee, by her first name.

[9]At trial, the defendant sought to portray Hamilton as having been involved in a check forging scheme with Marion that ended after the shooting, causing Hamilton to become resentful. Counsel elicited evidence from Hamilton that she and Marion had, together, forged checks that then were deposited in Hamilton's bank account. The defendant was permitted to argue in closing that the scheme had been a source of money for Hamilton and that Hamilton harbored resentment against Marion when the scheme ended and she left the McGee residence. The defendant also sought to elicit from Hamilton that she believed that Marion had contacted the social service agency responsible for removing Hamilton's children from her care. Hamilton denied having believed this and denied that she had threatened Marion with the loss of her children.

Hamilton,[10] see *Commonwealth* v. *Simmons*, 417 Mass. at 72, or to provide cumulative evidence of Hamilton's motive to fabricate her testimony regarding the defendant's role in the robbery and shooting. See *Commonwealth* v. *Cintron*, *supra* at 518. To the extent that it would have provided evidence of Hamilton's recantation, see note 10, *supra*, it is for the motion judge to determine the weight, reliability, and credibility of such evidence in light of the over-all evidence. See *Commonwealth* v. *Patton*, 458 Mass. 119, 131 (2010).

c. *Evidence of intimidation.* The defendant argues that Keeler intimidated Farrell such that Farrell invoked his Fifth Amendment privilege, thereby violating the defendant's constitutional right to present witnesses on his behalf. See *Webb* v. *Texas*, 409 U.S. 95, 97-98 (1972). As stated, following an evidentiary hearing, the judge concluded that there was no intimidation, and that Farrell decided not to testify after consultation with his court-appointed counsel. "A judge's findings of fact after an evidentiary hearing on a motion for a new trial will be accepted if supported by the record. The judge is the final arbiter of questions of credibility." *Commonwealth* v. *Rosario*, 460 Mass. 181, 195 (2011), quoting *Commonwealth* v. *Walker*, 443 Mass. 213, 224 (2005). "A reviewing court extends special deference to the action of a motion judge who was also the trial judge." *Commonwealth* v. *Rosario*, *supra*, quoting *Commonwealth* v. *Grace*, 397 Mass. at 307.

In his second motion for a new trial, in addition to reiterating

---

[10]Marion stated in an affidavit in support of the defendant's motion for a new trial that, a few weeks after the shooting, she informed Hamilton that she and her children would have to move out of Marion's apartment. Soon thereafter, Hamilton's children were removed from her custody by the Department of Children and Family Services (DCF, then the Department of Social Services). See St. 2008, c. 176, § 136. According to the affidavit, Hamilton believed that Marion had filed a report with DCF. Consequently, in June, 1997, Hamilton said something to Marion along the lines of, "You had my kids taken from me, I'm going to have your kids taken from you, wait and see what I do." Within days, Marion asserted in her affidavit, Hamilton had contacted police and told them that the defendant had confessed to her that he had shot the store clerk. The affidavit states further that, in the fall of 1997, Hamilton told Marion that she was sorry that she had lied to police about Marion's son, and that she had done it for the money and the "Section 8" housing certificate. The affidavit asserts also that, shortly after the defendant's trial, Hamilton collected the $25,000 reward money from the convenience store.

claims made in his first motion concerning Keeler's intimidation of Farrell, the defendant argued that events subsequent to the initial hearing revealed Keeler's reputation for dishonesty. He maintained that Keeler had engaged in misconduct in two other criminal matters in which Keeler was an investigator, and on that basis, sought reconsideration of the judge's decision on intimidation, as well as posttrial discovery. The judge denied the motion, stating, inter alia, that in her initial findings she had relied on Farrell's testimony and not on Keeler's.

Even assuming that Keeler intimidated Farrell such that Farrell decided not to testify, the defendant has not shown prejudice due to the absence of Farrell's testimony. See *Commonwealth* v. *Turner*, 37 Mass. App. Ct. 385, 390 (1994). See also *United States* v. *Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). As discussed, Farrell's proposed testimony would have provided little support for the defendant's case. It purported to benefit the defendant by suggesting that the murder weapon belonged to Fenderson. However, ownership of the gun in the photograph was of little consequence, so long as the defendant had access to the gun, and Farrell's testimony would have corroborated the Commonwealth's theory of access. Although Farrell's testimony also could have been used to impeach Fenderson, counsel cross-examined Fenderson regarding his ownership of the guns he was holding in the photograph, and elicited testimony that Fenderson cooperated with police because he feared that he might be charged with possession of the guns or with the shooting. Moreover, in his closing argument, counsel further developed the theory that Fenderson fabricated his testimony against the defendant out of such fear of being charged with a criminal offense. Cf. *Commonwealth* v. *Vieira*, 401 Mass. 828, 834 (1988) (no prejudice where defendant thoroughly cross-examined key witness notwithstanding Commonwealth's delay in providing exculpatory evidence).

d. *Ballistics evidence.* The defendant challenges the reliability of the Commonwealth's forensic ballistics evidence, asserting that errors in the admission of this evidence require that he be granted a new trial. We have reviewed the scientific underpinnings of such evidence and upheld its use. See *Commonwealth* v. *Pytou Heang*, 458 Mass. 827, 850 (2011).

Here, the evidence at trial showed that the bullet fragments extracted from the victim's body were consistent with being .38/.357 caliber ammunition.[11] Sergeant Detective Mark Vickers, a Boston police ballistics expert, testified that the black revolver shown in the photograph of Fenderson belonged to a class of revolvers with an eight-right-twist rifling characteristic, meaning "there are [eight] land engraved areas or groove areas within the barrel." The defendant's expert, whose report was submitted with the defendant's new trial motion, disputed this determination, stating that the photograph provided no information concerning the number of lands and grooves, and the gun also could have been a type that had six lands and grooves; based on the photograph alone, he could say only that the gun appeared to be a revolver. Both experts agreed that a large number of guns fall within the class of weapons that could have produced the bullet fragment.

The size of the class notwithstanding, there was no error in permitting the admission of Vickers's testimony concerning the gun's membership in the class of guns that could have produced the bullet fragment. See *Commonwealth* v. *Pytou Heang*, 458 Mass. at 848 ("a qualified ballistics expert may . . . offer an opinion based on the class or subclass characteristics that narrow the scope of possible firearms or eliminate a class of possible firearms as the source of the spent projectiles"). Vickers did not opine that the bullet fragment came from the black revolver in the photograph, and the defendant produced sub-

---

[11]Detective George P. Foley, who searched the crime scene for ballistics evidence, testified that he found no such evidence at the scene. He then obtained two bullet fragments taken from the victim's body by the medical examiner. Foley testified that when a bullet is discharged from a gun, it rifles through the barrel of the weapon in a certain direction, creating marks or striations on the bullet called "lands" and "grooves"; he examines these lands and grooves to determine the type of firearm from which the bullet was discharged. When Foley first visually inspected the largest fragment taken from the victim's body, he thought it had six lands and six grooves. Later, based on his examination of the fragment using a microscope, he revised his opinion and concluded that it had eight lands and eight grooves with a right directional twist.

The defendant's expert opined that the fragment "is a portion of a discharged .38 caliber class lead bullet and indicates 8 lands and 8 grooves with a right hand twist"; he agreed that Foley's revised classification of the bullet fragment was correct.

.

stantial evidence that any number of other guns could have produced the same rifling. "Whether or not the gun in question was in fact the murder weapon was an issue the jury surely understood." *Commonwealth* v. *Storey*, 378 Mass. 312, 322 (1979), cert. denied, 446 U.S. 955 (1980).

2. *Jury instruction on credibility.* The defendant contends that the trial judge erred in denying his request for an instruction regarding testimony by Hamilton, whom the defendant asserts was paid to testify. When Hamilton came forward with information that the defendant had confessed his role in the shooting to her, the prosecutor agreed to pay the cost of hotel accommodation for her and her children. The prosecutor also assisted Hamilton in obtaining a "Section 8" housing certificate. When an apartment was located, the prosecutor paid Hamilton's first month's rent, the security deposit, and a broker's fee. The total cost of this assistance was nearly $4,000.[12]

The defendant's trial counsel requested that the following instruction be given:

> "The testimony of a cooperating witness who provides evidence against a Defendant to escape punishment or receive leniency from law enforcement authorities for his or her own misdeeds or crimes, or for other personal reason or advantage, must be examined and weighed by the jury with greater care and caution than the testimony of an ordinary witness.

> "You, the jury, must determine whether a cooperating witness's testimony has been affected by self-interest, or by an agreement, implicit or explicit, he or she has with the government, or his or her own interest in the outcome of the case, or by prejudice or bias against the Defendant and his family."

A trial judge "is not required to grant a particular instruction so long as the charge, as a whole, adequately covers the issue." *Commonwealth* v. *Daye*, 411 Mass. 719, 739 (1992), quoting

---

[12]During her testimony, Hamilton denied that the Commonwealth made any other promises or that she had any expectation of collecting the $25,000 reward that had been offered by the convenience store for information leading to an arrest and conviction for the robbery and shooting.

*Commonwealth* v. *Anderson*, 396 Mass. 306, 316 (1985). See *Commonwealth* v. *Silva*, 388 Mass. 495, 507 (1983) (trial judge may use discretion "to choose a form of expression best adapted to make the law intelligible to the jurors"). Here, the judge instructed the jury that they should consider whether a witness "had a bias or motive which would have influenced [his or her] testimony"; "has any interest in the trial or any interest in its outcome"; or "has been influenced by any promises, rewards or any other inducements to testify." Moreover, counsel cross-examined Hamilton about these inducements, and argued forcefully in closing that Hamilton was motivated to lie by money and revenge. He argued that Hamilton "is a witness who was bought and paid for by the Commonwealth. She is a witness who had a motive to lie, she is a witness who was well rewarded for her lies."

The defendant was not entitled to a specific instruction that the jury should exercise special care and caution in evaluating Hamilton's testimony. The judge's general instructions adequately conveyed to the jury how they were to evaluate witness credibility, particularly in light of the fact that "defense counsel vigorously cross-examined [the witness] and vigorously argued to [the] jury her lack of credibility." *Commonwealth* v. *Daye*, 411 Mass. at 740.

3. *Limitations on use of firearm evidence.* Two bullet fragments were retrieved from the victim's body. As stated, the Commonwealth's experts testified at trial that, based on rifling marks located on the larger of the two fragments, the bullets were consistent with a .38/.357 caliber round capable of being discharged from a weapon with class characteristics of a .38 caliber revolver. Although the weapon used in the shooting was never recovered, several witnesses testified, without objection, that, prior to the day of the shooting, the defendant had a gun in his possession.[13] The jury could have found, based on expert

---

[13]Hamilton testified that she had seen a gun in the defendant's bedroom, and had seen him put the gun under a sofa cushion. Fenderson testified that he had seen "some .38 shells" in the defendant's bedroom. The photograph showing Fenderson in the defendant's bedroom holding a black revolver in his left hand and a silver gun in his right hand was introduced in evidence, and Ocampo testified that the defendant had handled the guns on the day the photograph of Fenderson was taken.

evidence, that the weapon the defendant possessed prior to the shooting was a .38 caliber revolver and that, immediately after the shooting, the defendant possessed a revolver of an undetermined caliber that he later discarded.

"Whether proffered 'evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error.' " *Commonwealth* v. *Spencer*, 465 Mass. 32, 48 (2013), quoting *Commonwealth* v. *Sylvia*, 456 Mass. 182, 192 (2010). The introduction of evidence that a defendant possessed a weapon on a prior occasion creates a risk that the jury will use the evidence impermissibly to infer that the defendant has a bad character or a propensity to commit the crime charged. See *Commonwealth* v. *Monico*, 396 Mass. 793, 807 (1986). However, evidence of "[a] weapon that could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime." *Commonwealth* v. *Barbosa*, 463 Mass. 116, 122 (2012). See, e.g., *Commonwealth* v. *Perez*, 460 Mass. 683, 695-696 (2011); *Commonwealth* v. *Williams*, 456 Mass. 857, 871 (2010); *Commonwealth* v. *Toro*, 395 Mass. 354, 356-357 (1985). "Such evidence is relevant for demonstrating that the defendant had the 'means of committing the crime.' " *Commonwealth* v. *Barbosa, supra*, quoting *Commonwealth* v. *Ashman*, 430 Mass. 736, 744 (2000).

To the extent the photograph of Fenderson showed him holding the black revolver, the judge did not abuse her discretion in permitting the introduction of the photograph. Nor was there an abuse of discretion in allowing the introduction of Hamilton's testimony concerning the gun she saw in the defendant's possession. The expert testimony suggested that the victim was shot with a .38 caliber revolver. The black revolver depicted in the photograph of Fenderson was consistent with that description, as was the revolver that Hamilton testified she saw in the defendant's possession both on the night of the shooting and earlier.[14] Therefore, such evidence was "relevant as a link in tending to prove that the defendant committed" the crimes

---

[14]Similarly, there was no abuse of discretion in permitting testimony concern-

charged. See *Commonwealth* v. *Perez*, 460 Mass. at 695, quoting *Commonwealth* v. *Toro*, 395 Mass. at 357.

There was no abuse of discretion in the judge's implicit determination that the probative value of such evidence outweighed the risk that the jury might use it as improper character or propensity evidence. See *Commonwealth* v. *Perez*, 460 Mass. at 696; *Commonwealth* v. *Gagnon*, 408 Mass. 185, 199-200 (1990), *S.C.*, 430 Mass. 348 (1999). Although the judge did not give a limiting instruction contemporaneous with the introduction of this evidence,[15] no such instruction is necessary for evidence showing that the defendant had the means to commit the crime. See *Commonwealth* v. *James*, 424 Mass. 770, 780 (1997); *Commonwealth* v. *Hamilton*, 411 Mass. 313, 322 (1991). The defendant disputes any link between the gun he was said to possess and the one used to shoot the victim, but it was for the jury to decide this question of fact. See *Commonwealth* v. *Daye*, 435 Mass. 463, 475 (2001); *Commonwealth* v. *James*, *supra*.

The silver gun shown in the photograph of Fenderson presents a separate question, since this gun, which Ocampo identified as an automatic, could not have been used to commit the crimes. See *Commonwealth* v. *Barbosa*, 463 Mass. at 122 ("Where a weapon definitively could not have been used in the commission of the crime, we have generally cautioned against admission of evidence related to it"). Such evidence may be admissible for purposes other than showing a defendant's bad character or criminal propensity, for example, to show that the defendant had access to or knowledge of firearms and bullets. See, e.g., *Commonwealth* v. *Ridge*, 455 Mass. 307, 322-323 (2009); *Commonwealth* v. *Otsuki*, 411 Mass. 218, 236 (1991). In general, however, we "have not . . . viewed the tenuous relevancy of evidence of a person's general acquaintance with weapons as outweighing the likelihood that such evidence will have an impact on the jury unfair to a defendant." *Commonwealth* v. *Toro*, 395 Mass. at 358. This principle holds especially true where, as here, forensic evidence establishes that the weapon

---

ing the .38 caliber shell casing found in the defendant's bedroom or Fenderson's testimony that, at some point, he saw .38 caliber shells in the defendant's bedroom.

[15]The judge did give a limiting instruction in her final charge.

could not have been used to commit the crime. See *Commonwealth* v. *Barbosa, supra* at 123. Often a limiting instruction is required as to the proper use of such evidence to ensure that its probative value outweighs the danger of unfair prejudice. See, e.g., *Commonwealth* v. *Ridge, supra* at 323; *Commonwealth* v. *Holliday*, 450 Mass. 794, 816, cert. denied sub. nom. *Mooltrey* v. *Massachusetts*, 555 U.S. 947 (2008).

Here, the judge did not provide a contemporaneous limiting instruction to advise the jury, and the instruction in her final charge did not instruct the jury adequately as to the proper use of the evidence concerning the photograph of Fenderson holding the silver gun.[16] Under these circumstances, the danger of unfair prejudice substantially outweighed the "tenuous relevancy" of the bullet shells and the second gun. See *Commonwealth* v. *Barbosa*, 463 Mass. at 123-124; *Commonwealth* v. *Toro*, 395 Mass. at 358.

Nevertheless, this evidence received only "scant attention" at trial. See *Commonwealth* v. *Barbosa, supra* at 124. Although the prosecutor impermissibly mentioned the second gun several times in closing, the evidence of the second gun was overshadowed by the evidence of the alleged murder weapon depicted in the same photograph. Thus, the evidence "had at most a 'very slight effect' on the jury" and did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v.

---

[16]The judge instructed the jury that if they accepted the evidence of the "items," including a "firearm," they could "consider it as determining whether or not there was motive, opportunity, intent, knowledge or identity." This instruction highlighted the evidence without advising the jury as to the proper purpose for which the Commonwealth introduced the evidence: to show the defendant's access to weapons. Contrast *Commonwealth* v. *Barbosa*, 463 Mass. 116, 121-122 (2012) ("You may consider this [nine millimeter evidence] as some evidence showing the defendant's familiarity with or access to firearms or firearms ammunition, but only if you first conclude that the defendant knowingly had possession, custody, or control over that nine millimeter evidence. If you're not satisfied the defendant had knowing possession, custody, or control over that ammunition and the magazine, then you should not consider that evidence in any way"); *Commonwealth* v. *Ashman*, 430 Mass. 736, 744 n.9 (2000) (jury instructed that evidence of knives "was admissible 'only on the issue that the defendant may have had the means to commit the offense that is at issue here . . . [and] there is no evidence that any of these knives was actually used' in connection with the victim's death").

*Barbosa, supra,* quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

4. *Review under G. L. c. 278, § 33E.* The defendant contends that we should exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial. After thoroughly reviewing the record in accordance with our duty under G. L. c. 278, § 33E, we conclude that there is no reason to exercise our authority to grant such extraordinary relief.

*Judgments affirmed.*