*Preston v. State*, No. 80, September Term, 2014.  Opinion by Harrell, J.

**Criminal Law—Jury Instructions—"Witness Promised Benefit"**

A witness provided by the State with reasonable protective housing before testifying at trial has not received a "benefit" within the meaning of Maryland Criminal Pattern Jury Instruction (2nd ed. 2012, 2013 Supp.) 3:13, "Witness Promised Benefit."

IN THE COURT OF APPEALS OF
MARYLAND

No. 80

September Term, 2014

DONTAE PRESTON

v.

STATE OF MARYLAND

Barbera, C.J.,
*Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

Opinion by Harrell, J.

Filed: July 27, 2015

*Harrell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Witnesses in criminal trials have typically a variety of interactions with the State prior to testifying under oath before a judge and/or jury. Usually, a witness is interviewed initially by a police officer or detective after the commission of a crime. Witnesses might be offered a monetary reward in exchange for coming forward with information pertaining to a crime. Witnesses "with a past" might exchange their testimony for a favorable plea deal arising from the case in which they are to testify or a related matter, or qualified or absolute immunity. In some cases, a witness might fear for his or her life, or for the safety of an immediate family member, and be placed in some form of witness protection program prior to and/or after trial to ensure his or her safety. In the present case, a witness was placed in protective housing for several months leading up to a murder trial after she claimed that the defendant showed up on her doorstep, causing her to be in fear of retaliation for talking with the police. We consider here whether her placement in reasonable protective housing constitutes a "benefit" that would compel the trial judge, upon request by the defendant, to give a particularized jury instruction pertaining to that witness's credibility (Maryland Criminal Pattern Jury Instruction (2nd ed. 2012, 2013 Supp.) 3:13, "Witness Promised Benefit"). We conclude that it does not.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

On the evening of 14 March 2009, Dontae Preston ("Preston"), Keon Barnes ("Barnes"), and Katrina Harrell ("Harrell") (no kin to the author of this opinion) attended an ill-fated co-ed "pajama party" at the home of Nichelle Payton ("Payton") at 1907 N.

Pulaski Street in Baltimore City.[1]  Shortly after the party got underway, Barnes was shot and killed on the premises.  Seven shell casings were recovered from the scene.  Sandra Bohlen, called at trial by the State as an expert in ballistics and firearms identification, testified that the bullets from all seven casings were fired from the same gun.  Dr. Carol Allen, a medical examiner called also by the prosecution, testified that Barnes died from multiple gunshot wounds.  No gun was recovered.  None of the casings tested positive for fingerprints.  Preston was charged with murder in the first degree, use of a handgun in the commission of a felony and crime of violence, and illegally carrying a handgun.

Two of the partygoers testified as eyewitnesses at Preston's trial in the Circuit Court for Baltimore City, which began on 21 May 2012.  Harrell, the first eyewitness called, testified that, at some point at the beginning of the evening, she exited Payton's home and went to her car (parked two or three doors down from the home, on the same side of the street) in order to retrieve a CD.  On her way to her vehicle, Harrell passed between Preston and Barnes as they were talking to each other on the top step leading to the front door of Payton's home.[2]  Harrell did not hear the substance of their conversation, but testified that they did not "appear to be arguing."  After she entered her car, she turned the key in order to unlock the CD player and remove the CD.  As she pushed the eject button, she heard gunshots.  She looked "up towards 1907," and saw

---

[1] Payton testified that, at the time of the party, she was renting 1907 N. Pulaski Street.

[2] Harrell testified that she consumed an alcoholic drink (a "whole glass" of "liquor") prior to walking past the two men.  She stated that, after drinking the liquor, she recalled being able to see and think clearly.  She testified also that she "d[idn't] recall" whether she was "intoxicated at that point."

Barnes lying on the steps, with Preston standing over him holding a gun with "fire [coming] from it." She ducked "under the seat" on the passenger side for a few seconds, and then called 911. After identifying Preston from a photo array weeks after the shooting, Harrell identified also Preston (who she referred to as "Beefie" or "Beefy") in court as the individual that shot Barnes.

Payton was the second eyewitness (of a sort) to testify at Preston's trial. Payton heard gunshots while she was inside her home preparing for the party. As she walked downstairs, she heard initially "a pop." Payton assumed that one of the balloons she had inflated for the party popped, until she heard more "pops" and realized that they were gunshots. She ran upstairs,[3] screaming, and looked out her bedroom window. She saw Barnes lying on the porch steps while Preston (who she referred to as "Beefie"/"Beefy" or "Donnie") went to his car and left the scene. She ran downstairs, opened the front door, and attempted to revive Barnes. Payton did not testify to seeing a gun in anyone's possession.

Defense counsel attempted to establish through cross-examination that Payton cooperated fully with the State only because the police agreed to move her to free, protective housing for several months prior to trial, although she testified that her experience in temporary protective housing "d[id] not cause [her] to come in here and say

---

[3] Before running upstairs, Payton observed that another partygoer, "Butter" (otherwise known as "Shawn"), closed the front door to her home. He had been "at th[e] door" to the residence outside as she came downstairs, but ran inside after the shots were fired. Payton testified that she did not see Butter holding a gun, but did see him run into the living room after closing the front door.

something [she] otherwise wouldn't." Much time was spent determining what information she volunteered to investigating detectives prior to trial and when it was volunteered. It was learned that, on the night of the murder, Payton accompanied homicide detectives to the police station, but told them simply that she hosted the party and named the guests in attendance. No written statement was sought or taken from Payton that night or shortly thereafter as she claimed not to have seen the shooting. Payton was interviewed a second time, one or two days later, but no additional substantive information was given or obtained.

Payton testified that, some number of days after the murder, Preston came to her house and knocked on the door. She was home, looked out the window, and saw Preston, but did not answer the door because she was scared. Preston did not threaten her verbally or communicate with her in any way, other than knocking on her door. Sometime after this event,[4] Payton called Detective Michael Moran, told him that she "was scared to stay there," and asked to be moved.

Payton identified Preston on 8 April 2009 in a photo array as having attended her party that night. She reported that she saw him go to his car after Barnes was shot. She gave also a taped statement to the police detailing what she saw on the evening of Barnes's death. Payton testified on direct examination that when she provided her statement to the police and identified Preston in the photo array, the police had not moved nor promised yet to move her into protective housing. Later, on cross-examination, she

---

[4] Payton's testimony suggested that Preston may have come to her home and knocked on her door twice before she moved into protective housing.

admitted that she did not tell the police initially that she witnessed a portion of the aftermath of the shooting. Defense counsel and Payton had the following exchange:

> [Defense Counsel]: And, in fact, you didn't cooperate or talk to the police or tell them anything about anything until after the point in time in which you say [Preston] came and knocked on your door? Is that correct?
>
> [Payton]: Correct.
>
> [Defense Counsel]: And that's when you then went and called the detectives and said I want to be moved, correct?
>
> [Payton]: He came to my house again.
>
> [Defense Counsel]: And you said that you wanted to be moved?
>
> [Payton]: Right.
>
> [Defense Counsel]: And on that day when they came to your house, you didn't give them a statement saying anything about anybody going across the street, did you?
>
> [Payton]: No.
>
> [Defense Counsel]: It wasn't until after you got assurances that they were going to move you, put you up and pay for you that you then gave a taped statement, isn't that correct?
>
> [Payton]: Correct. No.[5]

Detective Moran testified at trial that he spoke to Payton several times during the course of his investigation because she was scared and volunteered only small amounts of information at each interview. The detective explained that, on 3 April 2009, Payton

---

[5] Defense counsel did not ask follow-up questions to clarify this less-than-clear answer, moving instead to another line of questioning.

contacted him about how she was afraid for her life.[6] Detective Moran advised Payton to come to his office that day, but she declined, saying that she had something pressing to do with her children. Payton did not identify Preston from the photo array or give her taped statement to Detective Moran until five days later (on 8 April 2009). Six days after that, on 14 April 2009, Moran requested of the State's Attorney's Office that Payton be moved to protective housing.

Defense counsel questioned Detective Moran as follows:

> [Defense Counsel]: So, Detective, when you first got this phone call talking about how scared she was, why wouldn't you make the request then?
>
> Detective Moran: At that time, she was not completely honest as to what she saw. She was still really scared. She knows—
>
> [Defense Counsel]: So it was not until she gave you—
>
> COURT: Counsel.
>
> [Defense Counsel]:—that you asked for it then?
>
> COURT: Counsel. Counsel. I'm not saying it again, okay? Continue answering your question.
>
> Detective Moran: Could you repeat the question, sir?
>
> [Defense Counsel]: I'll rephrase the question. How come you waited until after she did a photographic array to put in that request to have her moved when she indicated that she was scared on April 3rd?
>
> Detective Moran: I actually believe it was under her request. It's a lot for someone to move their life. You know, you got

---

[6] Harrell identified Preston as the shooter in a photo array the day before, on 2 April 2009.

6

> kids. She has a grandmother who was sick in the house.
> That's her neighborhood. That's her life. And that's a lot to
> move somebody. So I think it was under her request that she
> finally said, ok, I'm ready now.

The Baltimore City State's Attorney's Office paid ultimately $13,530 to relocate Payton (with $400 of moving expenses facilitating the transition into—but not out of—temporary housing)[7] for a period of 7–8 months prior to trial.[8] Payton did not contribute to the expenses of her temporary housing situation. She was aware that the State's Attorney's Office paid for her protective housing, but did not know how much was paid. She testified further that she would not have asked the police or the State's Attorney's Office for assistance if she hadn't been afraid to continue to live at 1907 N. Pulaski Street.

Defense counsel requested that Maryland Criminal Pattern Jury Instruction (2nd ed. 2012, 2013 Supp.) ("MPJI-Cr")[9] 3:13, "Witness Promised Benefit" ("Jury Instruction 3:13"), be read to the jury. The requested instruction reads as follows:

> You may consider the testimony of a witness who [testifies]
> [has provided evidence] for the State as a result of [a plea

---

[7] The record is unclear as to whether the total expenditures (temporary housing and relocation expenses) by the State amounted to $13,530 or $13,950. As we discuss below, based on the unique facts of this case, the (relatively small) discrepancy makes no difference to our analysis.

[8] Payton testified that she was moved from 1907 N. Pulaski Street to a temporary residence "[t]oward the end of April/May" and remained in protective housing until November 2009. The State clarified during a bench conference that it paid for Payton's housing from July 2009 through February 2010.

[9] All references to the MPJI-Cr are to the Second Edition (with 2013 Supplement), unless otherwise noted.

7

agreement] [a promise that he will not be prosecuted] [a financial benefit] [a benefit] [an expectation of a benefit].[10] However, you should consider such testimony with caution, because the testimony may have been influenced by a desire to gain [leniency] [freedom] [a financial benefit] [a benefit] by testifying against the defendant.

Defense counsel proposed initially, before Payton testified, that the court read Jury Instruction 3:13 to the jury at the end of the second day of trial. The State objected, arguing that Payton's free housing was not the sort of situation contemplated by Jury Instruction 3:13, but rather was a protective measure "as a result of [Preston] coming to her house after this incident, and [Payton] contact[ing] the detective to let him know she was—she was in fear." The State argued that Jury Instruction 3:13 was "geared more towards somebody who's like a paid confidential or a paid informant, something of that sort that gives testimony, and knows how much compensation they're going to get in return." The trial judge declined at that time to give the instruction, but indicated he would revisit the question at the end of the trial:

> I'm going to say no right now, but depending upon how she testifies and what she says and whatever the other officers may say, I may revisit it.
> But based on what you've proffered, I don't believe it's appropriate. I believe it would be a situation where every time a witness is relocated or something along those lines, we'd need to read this. I don't think that's what this is for.

---

[10] *See infra* note 19.

The trial judge told defense counsel, however, that he had "a right to ask about free housing, because that's what she received," including the $400 given for moving expenses.[11]

After Payton's testimony, during a break in the trial when the court and parties discussed jury instructions, defense counsel objected to the omission of the "Witness Promised Benefit" instruction. The court denied the requested instruction, ruling as follows:

> All right. I have, again, I don't know what else is going to come out but, based on what has been presented so far, I still do not believe that it is an appropriate instruction given the fact that it was housing and I'm not sure, at least at this point, that it was an exchange for—let's see.
> "You may consider the witness who either testifies[,"] and she has[,] ["]or provided evidence," which she did for the State, "as a result of a plea agreement, a promise that he will not be prosecuted, a financial benefit, or benefit."
> This Court is not satisfied that the testimony or evidence was ["]as a result of.[ . . ."] So for those reasons, your request for that is denied over your objection.

Before closing arguments, the trial judge gave the jury the following instruction regarding the credibility of non-expert witnesses:

> Now, you are the sole judge of whether a witness should be believed. In making this decision, you may apply your own common sense and everyday experiences. In determining whether a witness should be believed, you should carefully judge all of the testimony and evidence and the circumstances under which the witness testified.

---

[11] During closing arguments, defense counsel did not argue to the jury that Payton provided evidence for the State because she received free, protective housing in return, nor that her testimony might be less credible because of this "benefit."

9

You should consider such factors as the witness'[s] behavior on the stand and manner of testifying, did the witness appear to be telling the truth, the witness'[s] opportunity to see or hear the things about which testimony was given, the accuracy of the witness'[s] memory, does the witness have a motive to not tell the truth, does the witness have an interest in the outcome of the case, was a witness'[s] testimony consistent, was a witness'[s] testimony supported or contradicted by evidence that you believe and whether and the extent to which the witness'[s] testimony in the court differed from the statements made by the witness on any previous occasion.[12]

You need not believe any witness, even if the testimony is uncontradicted. You may believe all, part, or none of the testimony of any witness.

. . .

You should also consider the witness'[s] certainty or lack of certainty, the accuracy of any prior description, and the witness'[s] credibility or lack of credibility, as well as any other factor surrounding the identification.

The jury convicted Preston of first-degree murder, use of a handgun in the commission of a crime of violence, and wearing, carrying, and transporting a handgun. The court sentenced Preston to incarceration for life (for the murder), with a consecutive term of incarceration for twenty years (for the use of the handgun) and a concurrent term of incarceration for three years (for the carrying conviction).

Preston appealed to the Court of Special Appeals, which affirmed. *Preston v. State*, 218 Md. App. 60, 96 A.3d 800 (2014). The intermediate appellate court

---

[12] This portion of the jury instructions is almost verbatim a previous version of MPJI-Cr 3:10, "Credibility of Witnesses" ("Jury Instruction 3:10"). The Second Edition of the MPJI-Cr, published in 2012, added a tenth factor for consideration: "whether the witness has a bias or prejudice."

considered whether the trial court abused its discretion in declining to give the "Witness Promised Benefit" jury instruction, concluding that it did not. *Preston*, 218 Md. App. at 62, 96 A.3d at 801–02. That court began by recognizing that "the decision whether to give the jury a particularized credibility instruction is left to the sound discretion of the trial judge." *Preston*, 218 Md. App. at 73–74, 96 A.3d at 808. Although the jury could have inferred, based on the unclear testimony adduced at trial, that Payton may have cooperated with the police because she expected to receive rent-free protective housing, the trial judge did not abuse his discretion in declining to give Jury Instruction 3:13 because the standard credibility instructions covered concerns regarding Payton's testimony, defense counsel cross-examined fully Payton regarding the protective housing, and defense counsel was free to argue in closing that Payton's credibility was questionable (though defense counsel chose not to). *Preston*, 218 Md. App. at 75, 96 A.3d at 809. The Court of Special Appeals concluded alternately that, even if the trial court abused its discretion, the error was harmless as Payton's testimony was corroborated by the testimony of Harrell, who "saw everything [Payton] did, and more." *Preston*, 218 Md. App. at 76, 96 A.3d at 810. Finally, in a footnote, the intermediate appellate court declined to address the State's alternative argument that Payton's receipt of protective housing was not the type of "benefit" Jury Instruction 3:13 was intended to cover. *Id.* n.4, 96 A.3d at 810 n.4.

11

Preston and the State filed petitions for writ of certiorari, which we granted, to consider the following consolidated and re-ordered questions[13]:

1. Is protective housing provided to a witness in a first degree murder case the type of "benefit" contemplated by the "witness promised benefit" pattern instruction?
2. Does the record show that there was a "promise" or "testimony" that was "as a result of" a promise?[14]
3. Is the "witness promised benefit" jury instruction part of a special class of instructions, as the Court of Special Appeals held, such that it remains always discretionary even when it is supported by some evidence?[14]
4. If so, did the trial court abuse its discretion in declining to give the instruction in this case, where an eye witness provided "some evidence" that she exchanged her cooperation with the State for free, protective housing?[14]
5. If not, did the court err as a matter of law in declining to instruct the jury as defense counsel requested?[14]

*Preston v. State*, 440 Md. 461, 103 A.3d 593 (2014). Because of our answer to the first question, we do not reach the others.

Regarding question 1, Preston argues that Payton received a "financial benefit" or "benefit" in the form of protective housing. He maintains that there is no principled

---

[13] Preston posed questions 3–5 in his petition for writ of certiorari. The State's cross-petition for writ of certiorari posed (in reverse order) questions 1–2.

[14] The bulk of the briefs filed by the parties concern questions 2–5 (as consolidated and re-ordered). Preston argues that Jury Instruction 3:13 is not a "purely discretionary" jury instruction and the trial court erred in not communicating the instruction to Preston's jury. He argues also that if trial courts are to have discretion over the administration of Jury Instruction 3:13, the Court of Appeals should adopt what it calls the "qualified entitlement" standard rather than the "unqualified discretion" standard. Preston argues further that the record reveals that Payton "exchanged her statement for the expectation of a benefit." The State, for its part, argues that the Court of Special Appeals applied properly an "abuse of discretion" standard of review and that the record does not show that there was a "promise" or "testimony" that was "as a result of" a promise.

12

distinction between the "indirect payment" of "rent-free housing" and a direct cash payment—both are "financial windfalls" that give a witness a motivation to lie on the State's behalf.[15] He alludes to cases from other jurisdictions in which enrollment in a witness protection program was viewed as a factor impacting potentially upon the credibility of a witness.

The State argues that, considering the context, the protective housing Payton received was not a "benefit" within the meaning of Jury Instruction 3:13. The State reasons that the "evident purpose" of the jury instruction implies a "fairly high threshold for what constitutes a 'benefit'"; to view it otherwise, the results could become absurd. Because protective housing is not akin to a plea agreement or a large cash payment, it should not be considered a benefit. The State highlights several points of contrast between a direct cash payment and protective housing valued in a similar amount: (1) Payton did not know the dollar value of the housing until trial, whereas paid informants know in advance the bargained-for value of their testimony; (2) the purpose of

---

[15] The record is silent regarding whether Payton was obligated, under the terms of her lease of 1907 N. Pulaski Street, to continue making monthly payments during her time spent elsewhere in protective housing, or whether she intended to return potentially to 1907 N. Pulaski Street after Preston's trial. The record is silent also regarding whether Payton forfeited any security deposits she may have paid previously (regarding 1907 N. Pulaski Street) as a result of her move into temporary protective housing.

Preston argues in his briefs that the protective housing provided by the State constitutes a "benefit" or "financial benefit." *See infra* note 18. To the extent that Preston sought at oral argument to squeeze under the umbrella of that argument the notion that Payton received also a "benefit" in that she was relieved from having to pay rent during the same period of time at 1907 N. Pulaski Street, we decline to consider it. Preston failed utterly to create a factual record that might entice us to make such an assumption and engage in an analysis based on that assumption.

protective housing is to keep a witness safe, whereas the purpose of a cash payment is to reward or pay a fee; (3) witnesses who receive protective housing are afraid, whereas witnesses who receive cash payments "desire to be rewarded"; and (4) cash can be used for any purpose, whereas protective housing is not a liquid asset.

Moreover, the State argues that Jury Instruction 3:13 is designed to address testimony from "jailhouse informants and persons from the criminal milieu" whose testimony should be viewed justifiably with some degree of suspicion, not citizens who are afraid of retaliation. The State references jury instructions from federal and other state jurisdictions and various cases discussing those instructions, which we will address below. Finally, the State concludes that any error committed by the trial court in not giving Jury Instruction 3:13 was harmless in light of defense counsel's relatively thorough cross-examination of Payton and his foregoing the opportunity to argue Payton's credibility during closing arguments.

## II. DISCUSSION

Maryland Rule 4-325 governs jury instructions in criminal cases:

> The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Maryland Rule 4-325(c). As the Court of Special Appeals in this case recognized rightly, this Rule has been interpreted to require trial courts to give jury instructions requested by a party when a three-part test is met. The instruction must state correctly the law, the

14

instruction must apply to the facts of the case (e.g., be generated by some evidence),[16] and the content of the jury instruction must not be covered fairly in a given instruction. *See Derr v. State*, 434 Md. 88, 133, 73 A.3d 254, 281 (2013), *cert. denied*, 134 S. Ct. 2723 (2014); *Cost v. State*, 417 Md. 360, 368–69, 10 A.3d 184, 189 (2010); *Dickey v. State*, 404 Md. 187, 197–98, 946 A.2d 444, 450 (2008); *Roach v. State*, 358 Md. 418, 428–29, 749 A.2d 787, 792–93 (2000). Nonetheless, the decision whether to give a jury instruction "is addressed to the sound discretion of the trial judge," *Gunning v. State*, 347 Md. 332, 348, 701 A.2d 374, 382 (1997), unless the refusal amounts to a clear error of law. *See Derr*, 434 Md. at 133, 73 A.3d at 281; *Cost*, 417 Md. at 369, 10 A.3d at 189.

The general purposes of jury instructions include: aiding the jury in understanding clearly the case, providing guidance for the jury's deliberations, and helping the jury to arrive at a correct verdict. *See General v. State*, 367 Md. 475, 485, 789 A.2d 102, 108 (2002). "Jury instructions direct the jury's attention to the legal principles that apply to the facts of the case." *Id.*

At Preston's trial, defense counsel requested that the trial judge give Jury Instruction 3:13, which we reproduce again for ease of reference:

> You may consider the testimony of a witness who [testifies] [has provided evidence] for the State as a result of [a plea agreement] [a promise that he will not be prosecuted] [a financial benefit] [a benefit] [an expectation of a benefit].[17]

---

[16] For an instruction to be generated by the evidence, the defendant need show only that "some evidence" supports the giving of the instruction. *McMillan v. State*, 428 Md. 333, 355, 51 A.3d 623, 636 (2012).

[17] *See infra* note 19.

> However, you should consider such testimony with caution,
> because the testimony may have been influenced by a desire
> to gain [leniency] [freedom] [a financial benefit] [a benefit]
> by testifying against the defendant.

We agree with the trial judge that reasonable protective housing does not constitute a "benefit" within the meaning of Jury Instruction 3:13.

*A. Use and Interpretation of*
*Jury Instruction 3:13 in Maryland*

Instructions, such as Jury Instruction 3:13, are premised on the supposition that undercover agents, jailhouse informants, accomplices, and other witnesses who testify for pay, immunity, or other forms of personal advantage may be motivated to lie or exaggerate in order to obtain a particular "benefit," and that, accordingly, their testimony might be viewed with a degree of skepticism. It is relatively easy to identify a plea agreement, a promise not to prosecute, or a financial benefit such as a reward.[18] The meaning of the term "benefit," however, is less clear.

Jury Instruction 3:13 does not define the term "benefit," nor is there any legislative history (or its equivalent) of which to speak.[19] Nonetheless, to determine the meaning of

---

[18] As noted earlier, Preston argues that the reasonable protective housing provided to Payton by the State may be considered either a "benefit" or a "financial benefit" within the meaning of Jury Instruction 3:13. We agree with the State that Payton received neither a "benefit" nor a "financial benefit" within the meaning of Jury Instruction 3:13. Although the reasonable protective housing provided to Payton can be assigned a monetary value (in this case, upwards of $13,000), that fact alone does not convert reasonable protective housing into a "financial benefit." *See supra* note 15.

[19] In the Second Edition of the MPJI-Cr, published in 2012, the optional clause "[an expectation of a benefit]" was added to the end of the first sentence of Jury Instruction 3:13.

(Continued…)

a term in the context of a non-legislative jury instruction, we import and apply common and well-established principles of statutory interpretation:

> We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. . . . [W]e may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.

*Moore v. State*, 424 Md. 118, 127–28, 34 A.3d 513, 518 (2011) (quoting *Ray v. State*, 410 Md. 384, 404–05, 978 A.2d 736, 747–48 (2009) (internal citations and quotations omitted)).

When conducting a "plain meaning analysis," dictionary definitions "'provide a useful starting point for discerning what the legislature could have meant in using a particular term.'" *Moore*, 424 Md. at 129, 34 A.3d at 519 (quoting *Ishola v. State*, 404 Md. 155, 161, 945 A.2d 1273, 1276 (2008)). *Black's Law Dictionary* defines the word "benefit" as "[t]he advantage or privilege something gives; the helpful or useful effect something has" or "[p]rofit or gain; esp., the consideration that moves to the promisee." *Black's Law Dictionary* 178 (10th ed. 2014). For its part, *Webster's Dictionary* defines the word "benefit" as "an act of kindness"; "something that promotes well-being"; or a

---

(…continued)
As the MPJI-Cr are prepared by the Maryland State Bar Association, Inc., Standing Committee on Pattern Jury Instructions, they are not statutory in nature and there are no publicly-accessible minutes from the Committee's meetings, "bills" containing suggested amendments, or any other formal "legislative" history.

17

"useful aid."  *Webster's Tenth Collegiate Dictionary* 106 (1993); *see Benefit, Google*, http://google.com (search "benefit definition") ("an advantage or profit gained from something").  These definitions are of little help to us here.  To understand the meaning of the term "benefit" in the relevant pattern instruction as defined in these two dictionaries would lead quickly to absurd results.  Such an understanding would be overbroad: if the prosecution paid for a witness's lunch, gave him or her a ham sandwich on the day of trial, or gave a witness a ride to the courthouse, such actions might be argued to warrant the giving of Jury Instruction 3:13, as meals or rides are "useful aid[s]" in the strictest sense of the term.  Similarly, if the conscience of a witness would become unburdened by testifying truthfully at trial, would Jury Instruction 3:13 be warranted because of the "helpful or useful effect" the act of testifying would have for such a troubled witness?

We noted in *Moore*, 424 Md. at 139, 34 A.3d at 525, that a word or phrase can have different meanings based on the context where it appears:

> There is no rule of construction which requires the same meaning always to be given to the same word, when used in different connections and in the same statute or in different statutes.  On the contrary, such is the flexibility of language and the want of fixity in many of our commonest expressions, that a word or phrase may bear very different meanings according to the connection in which it is found.  Hence the rule that the terms of a statute are always to be interpreted with references to the subject-matter of the enactment.

*Id.* (quoting Henry C. Black, *Handbook on the Construction and Interpretation of the Laws* 171–72 (2d ed. 1911)); *see Price v. State*, 378 Md. 378, 388, 835 A.2d 1221, 1227 (2003) ("We do not read the statute divorced from its textual context, for adherence to the

18

meaning of words does not require or permit isolation of words from their context." (internal quotations omitted)). As the term "benefit" appears at the end of a list of possible variants in Jury Instruction 3:13, we consider those variants as an aid in seeking the appropriate meaning of the term. Jury Instruction 3:13 applies when a witness testifies as a result of "[a plea agreement] [a promise that he will not be prosecuted] [a financial benefit] [a benefit] [an expectation of a benefit]."[20] We interpret the word "benefit," in the context of Jury Instruction 3:13, to mean something akin to a plea agreement, a promise that a witness will not be prosecuted, or a monetary reward or other form of direct, *quid pro quo* compensation or inducement. Reasonable protective services, such as those received by Payton, do not constitute a "benefit" within the meaning of Jury Instruction 3:13.

In the MPJI-Cr, most (if not all) of the pattern jury instructions are accompanied by "Comments" meant to explain or give context to individual instructions. The Comment to Jury Instruction 3:13 is quite short, and reads:

> Evidence that the State entered into an understanding or agreement with a testifying witness must be disclosed to the defendant, regardless of whether the agreement or understanding is formal or informal. *Harris v. State*, 407 Md. 503, 521, 966 A.2d 925, 935 (2009); *Ware v. State*, 348 Md. 19, 41, 702 A.2d 699, 709 (1997).

Neither case referenced in the Comment is helpful for present purposes. In both *Ware* and *Harris*, the primary arguments of the petitioners were that the suppression or withholding of certain evidence violated the State's constitutional obligations under

---

[20] *See supra* note 19.

*Brady v. Maryland*, 373 U.S. 83 (1963), and deprived them of fair trials. *Harris*, 407 Md. at 506, 966 A.2d at 927; *Ware*, 348 Md. at 24, 702 A.2d at 701. In both cases, testifying witnesses received the benefit of favorable plea deals and/or expected reductions in sentences at modification hearings in exchange for their testimony, but, in both cases, the prosecution did not disclose to defense counsel the full extent of the benefits before or during trial. *Harris*, 407 Md. at 522, 966 A.2d at 936; *Ware*, 348 Md. at 36–37, 702 A.2d at 707. These cases are inapposite because, in the case at bar, the jury was informed fully of Payton's receipt of reasonable protective housing; the question is whether the jury should have been given also Jury Instruction 3:13.[21]

There is a dearth of Maryland case law discussing Jury Instruction 3:13, despite the fact that some form of the instruction has been included in the Maryland Criminal Pattern Jury Instructions since at least 2001, *see* MPJI-Cr (1st ed. 1986, 2001 Supp.), if not before. *See Stouffer v. State*, 118 Md. App. 590, 630, 703 A.2d 861, 880 (1997) (referring to a "witness promised leniency" jury instruction with similar wording to Jury

---

[21] In *Harris*, the opinion notes that an instruction resembling Jury Instruction 3:10 was given to the jury, *Harris v. State*, 407 Md. 503, 526, 966 A.2d 925, 938 (2009), but the main "takeaway" of the case was that material evidence pertaining to the witnesses' credibility was withheld improperly from defense counsel and the jury, such that Harris was entitled to a new trial. *Id.* Jury instructions pertaining to credibility (such as Jury Instructions 3:10 and 3:13) were neither discussed nor at issue in *Ware*, which held simply that "[e]vidence of agreements or deals with witnesses often provides powerful impeachment evidence against a witness and enables a defendant to attack the motive or bias of a witness who might otherwise appear to have no motive to falsify or color his testimony." *Ware v. State*, 348 Md. 19, 50, 702 A.2d 699, 714 (1997); *see id.* at 41, 702 A.2d at 709 ("Evidence that the State has entered into an agreement with a witness, whether formally or informally, is often powerful impeachment evidence and the existence of such a 'deal' must be disclosed to the accused.").

Instruction 3:13), *aff'd in part & rev'd in part, State v. Stouffer*, 352 Md. 97, 721 A.2d 207 (1998). The few reported appellate Maryland cases in which Jury Instruction 3:13 (or a similar instruction) was given did not involve protective housing or protective services. *See Dickey v. State*, 404 Md. 187, 192, 194 n.3, 946 A.2d 444, 447, 448 n.3 (2008) (giving Jury Instruction 3:13 where the witness testified as part of a deal to avoid charges following an arrest for possession of controlled dangerous substances); *Riggins v. State*, 155 Md. App. 181, 196, 198 n.16, 843 A.2d 115, 123, 124 n.16 (2004) (giving Jury Instruction 3:13 where the witness received, in exchange for testimony, assistance in obtaining a bond review, $200 to pay bills, and a ride to a halfway house).

In *Stouffer*, 118 Md. App. at 595–96, 703 A.2d at 863–64, a defendant (convicted by a jury of first degree felony murder and kidnapping) argued, among other things, that the trial judge erred in refusing to give to the jury an instruction very similar to Jury Instruction 3:13. At the time a witness gave her statement to the police, they promised her that they would give her $200 for rent. *Stouffer*, 118 Md. App. at 603, 703 A.2d at 867. A detective testified that the $200 was given to the witness approximately a month or so after her statement was made, because she called and said that she was having trouble making her rent payment. *Id.* According to the detective, the money was not given *in exchange for* her statement. *Id.* The defendant requested a "witness promised leniency" instruction, which would have instructed the jury that it:

> may consider the testimony of a witness who testifies for the State as a result of a financial benefit. However, [they] should consider such testimony with caution, because the testimony may have been colored by a desire to gain a financial benefit by testifying against [the defendant].

21

*Stouffer*, 118 Md. App. at 630, 703 A.2d at 880.  The Court of Special Appeals held that the requested jury instruction was "not applicable under the facts and circumstances of the case" because "[t]here was no showing . . . that the witness was promised any financial benefit before the statement was made, nor was there evidence of a *quid pro quo*." *Id.*, 703 A.2d at 880–81.  Finally, the intermediate appellate court concluded that the trial judge's general credibility instructions fairly covered the issue.  *Id.*, 703 A.2d at 881.  The decision of the Court of Special Appeals in *Stouffer* was affirmed in part and reversed in part on other grounds by us.  *Stouffer*, 352 Md. 97, 721 A.2d 207 (discussing the sufficiency of the evidence to sustain Stouffer's convictions, without mentioning any jury instructions pertaining to credibility of witnesses).  Accordingly, the intermediate appellate court's decision is without precedential value.  *Cf. Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 446, 918 A.2d 470, 497–98 (2007) (Wilner, J., concurring) (characterizing a "decision" of the Court of Special Appeals "that this Court later vacated" as having "utterly no precedential value").  Nonetheless, we take note of it here to demonstrate merely that our colleagues on the intermediate appellate court have taken a restrained view toward the applicability of Jury Instruction 3:13.

### B.  Use and Interpretation of Similar Jury Instructions in Other Jurisdictions

Given the sparse, on-point authorities in Maryland, we turn to the decisions of our sister states and federal courts to inform our consideration of whether reasonable protective housing should be seen as a "benefit" within the meaning of Jury Instruction 3:13.  Jury instructions similar to Jury Instruction 3:13 are found in jury instruction

22

manuals and handbooks in state and federal jurisdictions nationwide. Despite the

ubiquity of these instructions, we found no reported case dealing squarely with the

question of whether reasonable protective housing—and nothing more—constituted a

benefit that warranted the giving of a particularized credibility instruction.[22]

---

[22] One unreported opinion from one district of California's intermediate appellate court system considered a very similar question to that facing us today. We do not include the case for any precedential or persuasive value, but to illustrate merely the paucity of opinions nationally as to this discrete issue. *See Burson v. Capps*, 440 Md. 328, 350 n.23, 102 A.3d 353, 367 n.23 (2014).

   In *California v. Ali*, No. D058357, 2013 WL 452901, at *1 (Cal. Ct. App. Feb. 7, 2013), Ali was convicted by a jury of murder, attempted murder, shooting at an inhabited structure or vehicle, being a convicted felon in possession of a firearm, and unlawfully possessing a firearm. Ali argued that reversal of the judgment in his case was warranted for a number of reasons, the most relevant of which for present purposes was the trial judge's refusal to give a requested jury instruction on "benefits provided" to certain witnesses. *Ali*, 2013 WL at *15. Ali requested the jury instruction with regards to the testimony of four witnesses. *Id.* The jury heard evidence that the first witness received threats and was relocated by the district attorney to a different state, and received monthly payments for his living expenses. *Id.* The second witness (who was deceased at the time of trial) was relocated also to another state and received "benefits" totaling $2,409 before his death. *Id.* The final two witnesses were a boy and his mother, who received assistance from an investigator in the district attorney's office when that individual "check[ed] on the status of a police investigation" concerning an immediate family member of the two. *Id.*

   As California pattern jury instructions did not contain a specific instruction addressing how the jury might view witnesses who receive "benefits" from the prosecution, Ali requested that the trial judge give an instruction based on a model instruction from the federal Ninth Circuit Court of Appeals. *Id.* The requested jury instruction stated:

> You have heard testimony that [the witness] has received benefits, compensation, favored treatment, from the government in connection with this case. You should examine [the witness's] testimony with greater caution than that of other witnesses. In evaluating that testimony, you should consider the extent to which it may have been influenced by the receipt of benefits from the government.
>
> (Continued…)

23

The reported case with the closest factual scenario to the present case emanates from the United States Court of Appeals for the Fifth Circuit. In *United States v. Partin*, 552 F.2d 621, 643 (5th Cir. 1977), a witness testified during direct examination that he was in the federal witness security program and that, as part of the program, he was given a new name and social security number, as well as just over $1,000 per month in

---

(…continued)

*Id.* The trial judge declined to give the requested instruction, explaining that the substance of the requested instruction was covered fairly by other instructions, and as to the mother and son duo, there was no evidence of any "benefit" received. *Id.* The jury received the following general credibility instruction:

> In evaluating a witnesses [sic] testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors you may consider are: . . . Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided.

The California Court of Appeal agreed with the trial judge that there was no evidence that the mother and son received any benefits, as the district attorney investigator provided merely information about the status of an investigation, but did not influence the investigation in any way. *Id.* That reviewing court determined that the general credibility instruction "sufficiently instructed the jury to consider a witness's bias and allowed defense counsel to argue that the witnesses were biased because of benefits they received from the prosecution." *Id.*

Finally, the California intermediate appellate court concluded that the requested jury instruction was "improperly argumentative" as it required an inference not supported by law. *Ali*, 2013 WL at *16. Specifically, the requested instruction would have directed the jury that it "must" view the witness's testimony "with greater caution," but "no . . . authority exists for witnesses provided relocation services, just as no authority exists for an instruction requiring a juror to view the testimony of an immunized witness with greater caution." *Id.* The court concluded that the trial judge did not err in declining to give the requested instruction, *id.*, and determined ultimately that none of the errors raised by Ali warranted reversal of his conviction. *Ali*, 2013 WL at *23.

subsistence payments for himself and his family. Defense counsel did not object to the witness's testimony, and also did not cross-examine the witness regarding his participation in the program. *Partin*, 552 F.2d at 644–45. Defense counsel did argue at closing, however, that the witness was not credible. *Partin*, 552 F.2d at 645. The trial judge gave the jury the following instruction:

> All evidence of a witness whose self-interest is shown from either benefits received, whether they be received in money, in protective custody afforded by the Government or any other benefit, or any detriments suffered, threats or promises made, or any attitude of the witness which might tend to prompt testimony either favorable or unfavorable to the accused should be considered with caution and weighed with care.
>
> The Attorney General of the United States is authorized by law to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses. The Attorney General is likewise authorized by law to provide for the health, safety and welfare of witnesses and their families. This may include the payment of money, providing a new identity and securing a job to minimize the physical and economic harm to the witnesses and their families.

*Partin*, 552 F.2d at 644. Defense counsel did not object to the instruction as given, and requested an *additional* instruction that the instruction recounted above did not imply "the Court's acceptance or rejection of [the witness's] expressed fear." *Id.* The judge rejected the additional instruction. *Id.* On appeal, the Court of Appeals for the Fifth Circuit began by noting the uncontested point that the defense had a right to put on evidence that the witness participated in the protection program. *Partin*, 552 F.2d at 645 ("The defense has a right to show that a witness, while in the [witness protection] program, has received substantial benefits . . . ."). The court mused that the first

25

paragraph of the given jury instruction "tends to cast doubt on [the witness's] credibility because of his participation in the witness security program." *Partin*, 552 F.2d at 645 n.31. Nonetheless, that court concluded that the instruction as given did not imply that the trial judge believed or disbelieved the witness and so "the additional instruction was properly refused." *Partin*, 552 F.2d at 645.

We assign little persuasive weight to *Partin* for several reasons. First, based on our review of pattern jury instructions both in the federal Fifth Circuit and nationwide, the given instruction does not appear to have an origin in any compilation of pattern instructions we were able to find and we cannot discern its origin.[23] It appears that jury instructions like the one administered in *Partin* are not given commonly, despite the frequency with which federal and state witnesses alike participate in various forms of witness protection programs. Second, the propriety of the jury instruction as given was not under review by the Fifth Circuit, as the federal Court of Appeals considered only whether the trial judge erred in declining to give an additional, supplemental instruction. *Partin*, 552 F.2d at 644.[24]

---

[23] Our search for this jury instruction and similar variants exhausted the outer reaches of Westlaw's legal research database and Google's all-seeing search engine.

[24] To the extent that *Partin* contains a kernel of persuasive force, it suggests that the "benefits" the witness received pursuant to the federal government's witness protection program would not have been covered fairly by any then-existing pattern jury instruction in the Fifth Circuit, some of which are similar to those found in the MPJI-Cr. The oldest published volume of pattern jury instructions from the Fifth Circuit that we were able to locate was compiled in 1978 from then-existing commonly used jury instructions. Fifth Circuit Pattern Jury Instructions (Criminal Cases) (1978 pamph.). Only one pattern instruction—No. 6—addressed the credibility of witnesses. It resembles somewhat

(Continued…)

26

We turn now to a recent case from one of our sister states. In Massachusetts, the Commonwealth's highest court considered in dicta whether certain questions addressed by the judge to prospective jurors during vior dire necessitated a new trial. *Massachusetts v. Connor*, 467 N.E.2d 1340 (Mass. 1984). Two witnesses in Connor's trial were participants in the Federal witness protection program and "received substantial financial and other benefits thereunder" (although the opinion does not detail what specific "benefits" were received). *Connor*, 467 N.E.2d at 1348. One of those witnesses was a participant, who became an informer, in the criminal activities for which Connor was being tried; the other had criminal charges pending in an unrelated matter. *Connor*, 467 N.E.2d at 1344. The judge asked the prospective jurors whether the fact that a

---

(…continued)

Maryland's Jury Instruction 3:10 in its suggestion that jurors consider, among other things, a witness's "manner of testifying," "his candor, fairness and intelligence," and "his relationship to the Government or the Defendant," as well as "his interest, if any, in the outcome of the case." The Fifth Circuit's general credibility instruction is now numbered 1.08. Federal Jury Practice and Instructions, Pattern Jury Instructions: Fifth Circuit, Criminal Cases (2012) 1.08, "Credibility of Witnesses." Over the course of various amendments and additions, the Fifth Circuit has added particularized credibility instructions. *See* 1.14 (Accomplice—Informer—Immunity) and 1.15 (Accomplice—Co-Defendant—Plea Agreement), which together resemble fairly our Jury Instruction 3:13.

The opinion in *Partin* is silent regarding whether that jury received the general credibility instruction referenced above or any other similar general jury instructions. *United States v. Partin*, 552 F.2d 621 (5th Cir. 1977). Nonetheless, the trial judge found the available general credibility instructions inapplicable apparently to a situation where a witness received protective custody from the federal government, and administered instead the particularized instruction noted above.

27

witness had received "benefits" under the witness protection program would affect their assessment of the witness's credibility.[25] *Connor*, 467 N.E.2d at 1348.

The Supreme Judicial Court of Massachusetts concluded that such questioning "improperly invaded the province of the jury." *Id.* Because a witness's "receipt of benefits under the witness protection program" is "highly relevant to his credibility and entirely appropriate for the jury's consideration," the questioning improperly "conveyed a message to the jury that they should not consider matters that they were entitled to consider." *Id.* The problem was "compounded" (according to that court) when the prosecutor misstated the law during closing arguments by telling the jury that they had sworn to treat the testimony of the witnesses "equally." *Id.* Based on the particular circumstances of the case,[26] the Massachusetts high court concluded that the error probably did not necessitate reversal in light of the trial judge's "arguably . . . curative" instructions. *Connor*, 467 N.E.2d at 1349. The trial judge's credibility instructions were as follows:

> Now, you may consider and give such weight, if any you see fit, that certain witnesses have received protection and financial and other benefits under the federal government's Witness Protection Program. You've heard a considerable mass of evidence in regard to that. It's for you to determine

---

[25] The trial judge asked also whether the fact that a witness was a participant in the crime would affect the juror's assessment of the witness's credibility. *Massachusetts v. Connor*, 467 N.E.2d 1340, 1348 (Mass. 1984).

[26] Defense counsel did not object to the court's questioning, but did object to the prosecutor's closing arguments and moved for a mistrial on that basis. *Connor*, 467 N.E.2d at 1348–49.

28

> what effect, if any, what weight, if any, you will give to that situation in regard to any particular witness.
>
> . . .
>
> You remember in my early, early discussions with you over in the church hall and here in the court, we had what I thought was a rather extensive discussion over there about jury duty, and then an extensive voir dire when I asked you questions here. It may be that in going into certain matters, such as the Witness Protection Program, that I emphasized one thing more than another. . . . [Y]ou will take the law in regard to these cases as I have just given it to you, and not discuss or be concerned with any questions that I asked you in regard to your qualifications to sit on the case or those preliminary instructions.

*Id.* n.9. The defendant requested a further instruction that the testimony of a witness who testifies "for personal advantage" must be received "with great caution," but the trial judge declined to give that instruction. *Id.*

Curious procedural posture aside, this case we find unhelpful largely for many of the same reasons we eschew *Partin*. Just as in *Partin*, the provenance of the trial judge's "arguably . . . curative" instructions are unknown. At the time, the Massachusetts District Court Criminal Model Jury Instructions (1979, 1985 ed.) Instruction 2.07, "Credibility of Witnesses" ["Massachusetts 2.07"] contained that state's general credibility pattern instruction, which states that jurors may consider, among other things, a witness's "motive for testifying," "any bias he has shown in his or her testimony," and "the interest or lack of interest the witness may have in the outcome of the case."[27] The instruction

---

[27] This jury instruction has since become Instruction 2.260, "Credibility of Witnesses." Massachusetts Criminal Model Jury Instructions (3rd ed. 2009, 2nd Supp. 2013)

(Continued…)

contains several "Supplemental Instructions," including one on "Interested witnesses," which provided, "[t]he fact that a witness may have some interest in the outcome of this case doesn't mean that the witness isn't trying to tell you the truth . . . . But the witness's interest is a factor that you may consider along with all the other factors."[28] Massachusetts 2.07 (1974, 1988 ed.). Accordingly, Massachusetts 2.07 resembles Maryland's Jury Instructions 3:10 and 3:13. The *Connor* opinion is silent regarding which, if any, other instructions the jury received. To the extent that *Connor* resembles the case at bar, we think that it suggests that the "benefits" the witness received pursuant to the federal government's witness protection program would not have been covered fairly by the existing pattern jury instructions in Massachusetts.

In another case from Massachusetts, a defendant was convicted of murder in the first degree of a clerk in a convenience store. *Massachusetts v. McGee*, 4 N.E.3d 256, 259 (Mass. 2014). On appeal, McGee argued (among other things) that the trial judge erred in denying his request for a particularized credibility instruction for a witness that the defendant argued was paid to testify. *McGee*, 4 N.E.3d at 266. When the witness

---

(…continued)
(providing that the jury may consider "his motive for testifying, whether he displays any bias in testifying, and whether or not he has any interest in the outcome of the case").

[28] The current Instruction 2.260 contains an additional supplemental instruction on a "Prosecution witness with plea agreement contingent on truthful testimony." Massachusetts Criminal Model Jury Instructions (3rd ed. 2009, 2nd Supp. 2013) Instruction 2.260, "Credibility of Witnesses." This supplemental instruction provides that jurors may consider the testimony of those who have reached plea agreements with the Commonwealth "with particular care," and may consider also whether the witness's testimony "has been affected by his interest in the outcome of the case and any benefits that he has received or hopes to receive." *Id.*

30

came forward with information that the defendant confessed his role in the murder to her, the prosecutor agreed to pay the cost of hotel accommodations for her and her children. *Id.* The prosecutor assisted the witness in obtaining a "Section 8" housing certificate, and, when an apartment was located, paid the witness's first month's rent, security deposit, and broker's fee. *McGee*, 4 N.E.3d at 266–67. The total cost of assistance was nearly $4,000. *McGee*, 4 N.E.3d at 267. The witness testified that she was aware that the convenience store employer of the victim offered a $25,000 reward for information leading to the arrest and conviction of the shooter, but denied having any expectation of collecting the reward. *Id.* n.12.

The defendant requested that the trial judge give the following jury instruction:

> The testimony of a cooperating witness who provides evidence against a Defendant to escape punishment or receive leniency from law enforcement authorities for his or her own misdeeds or crimes, or for other personal reason or advantage, must be examined and weighed by the jury with greater care and caution than the testimony of an ordinary witness.
> You, the jury, must determine whether a cooperating witness's testimony has been affected by self-interest, or by an agreement, implicit or explicit, he or she has with the government, or his or her own interest in the outcome of the case, or by prejudice or bias against the Defendant and his family.

*McGee*, 4 N.E.3d at 267. The trial judge declined to give the requested instruction, but gave instead an instruction that the jury should consider, among other things, whether a witness "had a bias or motive which would have influenced [his or her] testimony," "has any interest in the trial or any interest in its outcome," or "has been influenced by any promises, rewards or any other inducements to testify." *Id.* At trial, defense counsel

cross-examined the witness about the "inducements," and argued in closing that the witness was motivated to lie by money and revenge. *Id.* He argued that she "was bought and paid for by the Commonwealth. She is a witness who had a motive to lie[;] she is a witness who was well rewarded for her lies." *Id.*

On appeal, the Massachusetts high court, without much explanation, concluded that the defendant was not entitled to the requested instruction as the trial judge's instructions "adequately conveyed to the jury how they were to evaluate witness credibility, particularly in light of the fact that defense counsel vigorously cross-examined [the witness] and vigorously argued to [the] jury her lack of credibility."[29] *Id.* (internal quotations omitted). Although the impetus for the services provided to the witness in *McGee* is distinguishable from that of the services provided here to Payton, the modality of the services provided are somewhat similar. *McGee*, 4 N.E.3d at 266–67. Just as the relocation and housing services in *McGee* did not constitute a "personal reason or advantage" sufficient to justify a particularized credibility instruction, so the reasonable protective housing offered to Payton do not constitute a "benefit" within the meaning of Jury Instruction 3:13.

---

[29] It is unclear, based on the Massachusetts high court's decision, whether that court would have concluded that McGee was entitled to the requested instruction had his lawyer not argued in closing the issue of the witness's credibility (as Preston's lawyer refrained from doing here). *Massachusetts v. McGee*, 4 N.E.3d 256, 267 (Mass. 2014). That court may have conceived of the actions of defense counsel as plus factors in the calculus of whether the trial judge abused her discretion, or the Massachusetts high court may have meant to insinuate that any error committed by the trial judge would have been harmless. Because the Supreme Judicial Court did not expound fully enough its reasoning, the opinion is of limited persuasive force here.

An Illinois case of passing similarity was resolved along similar lines.  In *Illinois v. McInnis*, 411 N.E.2d 26, 39 (Ill. App. 1980), a witness testified that, in exchange for his testimony, he: (1) was "housed in witness quarters" while the case was pending; (2) received assistance from the state in relocating from his former neighborhood; (3) received rent payments in his new building paid by the State; and, (4) hoped to collect a $5,000 reward.  The witness admitted also that the State prosecutor promised to try to get his probation extended at an upcoming violation of probation hearing.  *Id.*  The jury received the following credibility instruction:

> You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them.  In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have, and the reasonableness of his testimony considered in light of all the evidence in the case.

*McInnis*, 411 N.E.2d at 38.  Defense counsel requested, but did not receive the benefit of, a particularized credibility instruction:

> The testimony of a witness who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness.  The jury must determine whether the witness'[s] testimony has been affected by interest, or by prejudice against the defendant.

*McInnis*, 411 N.E.2d at 39.  The intermediate appellate court of Illinois determined that the instructions as given covered adequately potential bias and prejudice concerns, and the trial court did not err in declining to give the particularized instruction sought by McInnis.  *McInnis*, 411 N.E.2d at 40.  We are sympathetic to the conclusion reached by

33

the trial and appellate courts in *McInnis*, just as in *McGee*, that the protective services provided to the witness did not constitute a "personal advantage or vindication" so as to warrant a particularized credibility instruction.[30]

In considered dicta, the United States Court of Appeals for the Sixth Circuit considered the value of particularized credibility instructions for informants and participants in the federal witness protection program. *United States v. Adamo*, 742 F.2d 927, 944 (6th Cir. 1984). That court observed that participation in a witness protection program may have mixed implications for a witness's credibility: "[i]nformation that a witness is a participant in [the Witness Protection Program], and therefore is being paid and protected by the federal government, simultaneously enhances and undermines a witness'[s] credibility." *Id.* The court drew a distinction in credibility concerns, however, between paid informants and protected citizens:

> A distinction must be made between government witnesses who are merely paid informants and those which are participants in the Witness Protection Program. References to a witness being a paid informant undermine the credibility of the government's witness without raising any negative inferences against a defendant. . . . A totally different concern arises when the government's witness is protected, for this may in some cases raise negative inferences against the defendant if great care is not employed.

---

[30] We recognize that the witness in *McInnis* received also assistance in obtaining an extension of probation (despite a violation) and a potential $5,000 reward. *Illinois v. McInnis*, 411 N.E.2d 26, 39 (Ill. App. 1980). Such benefits would warrant likely in Maryland the administration of a particularized credibility instruction such as Jury Instruction 3:13.

*Adamo*, 742 F.2d at 945 n.25. That court encouraged lower courts to instruct testifying witnesses not to refer to their participation in witness protection programs at all when testifying before a jury, *Adamo*, 742 F.2d at 945, and if the program must be referenced, attorneys should use the term "relocation" in lieu of "protection," so as to avoid potential negative implications. *Id.* n.25. The court concluded by supposing that, in some situations:

> The better course is probably for counsel to ask the trial judge to contemporaneously instruct the jury that the protection afforded by the witness should neither enhance that witness'[s] credibility nor necessarily be construed to mean that the defendant has threatened the witness. Jurors are quite capable of understanding that government informants are the objects of hostility of any general prison population and the "at large" criminal community. . . . On the other hand, unless abuse by the prosecutor is shown, we do not require the Court to handle the matter of protected witnesses itself.

*Id.* n.27. We find this dicta from the Sixth Circuit unhelpful, as, based on the above-quoted text, it seems clear that that court has a different perspective on the impact of witness protection on the course of a trial than we do. We see no reason to instruct testifying witnesses not to refer to their participation in such programs and are accordingly not inclined to follow that court's suggestion that jurors receive a particularized jury instruction that encourages neutrality.

The parties have not presented us with—and we were not able to find—any other cases on point. Federal cases abound in which parties debate the admissibility at trial of the fact that a witness participated in the federal witness protection program. *See, e.g.,* *United States v. Talley*, 164 F.3d 989, 1003 (6th Cir. 1999) (determining that the trial

35

judge did not abuse his discretion in instructing the jury to disregard testimony regarding a witness's relocation, and that such questioning did not warrant a mistrial where the defendant opened the door to the witness's motivation to lie in opening statements and later cross-examined the witness); *United States v. Caliendo*, 910 F.2d 429, 436 n.5 (7th Cir. 1990) (citing decisions where other courts held that defense counsel may elicit testimony regarding participation in witness protection programs "when the information is sought to inform the jury of all of the benefits bestowed upon a witness in return for his cooperation"); *United States v. Tarantino*, 846 F.2d 1384, 1407 (D.C. Cir. 1988) (affirming the trial court's decision to allow the defendant to cross-examine a witness, with certain limits, on "benefits" a witness received while in the federal witness protection program, but where the defendant chose not to employ such a line of questioning); *Adamo*, 742 F.2d at 944–46; *United States v. Librach*, 520 F.2d 550, 553 (8th Cir. 1975) (concluding that the prosecution failed improperly to disclose to the defense that a witness had been in protective custody and received immunity and nearly $10,000). Questions of admissibility do not concern us here, however, as defense counsel was able to cross-examine fully Payton on the relocation assistance and reasonable protective housing provided to her.

Other courts have discussed the intersection between witness credibility and witness protection programs, but with no exploration of the appropriateness of jury instructions pertaining to credibility. At least one state appellate court concluded that services (including protective housing and food) provided to a witness pursuant to a witness protection programs do not constitute a "fee" paid to a witness. *California v.*

36

*Jenkins*, 997 P.2d 1044, 1121 (Cal. 2000), *as modified* (June 28, 2000) (concluding, in an automatic appeal from the imposition of the death penalty, that the defendant was not denied a fair trial because certain witnesses received "benefits . . . under the witness protection program" and were therefore "unreliable," and where defense counsel chose not to cross-examine the witnesses on participation in the program); *see also Minnesota v. Bowles*, 530 N.W.2d 521, 534 (Minn. 1995) (allowing the defendant to expose potential biases of a witness on cross-examination where that witness received "benefits" in the form of witness protection and leniency in other criminal cases).

Still others refer to services received pursuant to witness protection programs as "benefits," but not in the context of whether particularized credibility jury instructions (or jury instructions at all, for that matter) are warranted. *See, e.g., Gonzalez v. Wong*, 667 F.3d 965, 1007 (2011) (discussing an investigation into abuses of a "benefits" program for jailhouse informants, where "benefits" included transfers to cells with a television and/or coffeepot, being taken outside of the jail for lunch, witness protection program money being paid to an informant's wife, and having a girlfriend released with no bond while her trial was pending); *Talley*, 164 F.3d at 1003; *Caliendo*, 910 F.2d at 436 n.5; *Tarantino*, 846 F.2d at 1407; *Connecticut v. McClain*, 105 A.3d 924, 926–29 (Con. App. 2014) (referring to the "benefits derived from the witness protection program" and the amount of time he was "receiving benefits from the State, and how much money he had received"); *see also United States v. Pandozzi*, 878 F.2d 1526, 1530 (1st Cir. 1989) (using the term "promises" to refer to a witness's agreement to accept participation in a witness protection program, "favorable testimony" on his behalf at the witness's sentence

reduction and parole hearings, transfer to a different prison, and "use" immunity, in exchange for testimony).

In many cases, witnesses received a variety of discrete benefits in exchange for their testimony, and courts oftentimes used the term "benefits" to refer to an entire package, which include oftentimes some combination of witness protection, a plea deal, immunity from prosecution, early parole, and cash payments. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 300 (1991) (referring to "benefits" received, including a cash payment, immunity, and eventual placement in the witness protection program); *Bond v. Procunier*, 780 F.2d 461, 462 (4th Cir. 1986) (referring to "benefits" where a witness was granted immunity, as well as a new identity and a job under the federal witness protection program); *United States v. Bufalino*, 683 F.2d 639, 647 (2d Cir. 1982) (referring to "benefits" where one witness stood to receive a plea deal, immunity, and $200,000 as part of a witness protection program, and where another witness stood to receive early parole and participation in a protection program); *Manning v. Buchan*, 357 F.Supp.2d 1036, 1055 (N.D. Ill. 2004) (referring to "benefits" received pursuant to the witness protection program, including cash payments); *Bowles*, 530 N.W.2d at 534; *Illinois v. Cotton*, 913 N.E.2d 578, 583, 592 (Ill. App. 2009) (referring to "benefits" received where a witness reached a plea agreement and was placed in the witness protection unit of the Cook County jail). In many of these benefits-package cases, the juries received particularized credibility instructions relating to the "flagship" benefits received, and are accordingly of little help to us here as we determine whether the receipt of reasonable protective housing alone constitutes a "benefit" warranting Jury Instruction 3:13.

38

For example, in *United States v. Holmes*, 229 F.3d 782, 784 (9th Cir. 2000), a witness testified against a defendant in an armed bank robbery case. Prior to the robbery, the witness had met Holmes, a friend of her husband, on a number of occasions. *Id.* Approximately six weeks after the robbery, the witness approached the police "ask[ing] them about the possibility of getting money in exchange for the information." *Id.* She identified Holmes as one of the robbers, but testified that, at the time she provided the information to police, she did not know "one way or the other" if she would receive compensation. *Id.* After a meeting with the FBI, she received $1,500. *Id.* After that point, the FBI placed her in its "informant program," and following her grand jury testimony, she received an additional $4,500 "to help her relocate away from her husband." *Id.* The witness testified at a pre-trial hearing, however, that the "compensation" she received from the FBI was not "related in any way to testimony [she] might provide in this case." *Holmes*, 220 F.3d at 786 n.2. Holmes argued that the trial judge erred by not delivering the following jury instruction:

> You have heard testimony that ___, a witness, has received [benefits, compensation, favored treatment, etc.] from the government in connection with this case. You should examine ___'s testimony with greater caution than that of ordinary witnesses. In evaluating that testimony, you should consider the extent to which it may have been influenced by the receipt of [e.g., benefits] from the government.

*Holmes*, 220 F.3d at 785. Instead, the trial judge told the jury:

> In considering the testimony of a witness, you may take into account: . . . (4) the witness'[s] interest in the outcome of the case and any bias, prejudice, *and whether the witness received money or benefits from the Government in*

39

> *connection with the case*; . . . and (7) any other factors that bear on believability.

*Holmes*, 220 F.3d at 787 (emphasis in original). The United States Court of Appeals for the Ninth Circuit determined that the trial judge did not err in declining to give the particularized jury instruction in light of the more general instruction given, and, based on the witness's testimony about the "circumstances surrounding her compensation," the jury's attention was drawn already to the fact that she was a "paid informant." *Holmes*, 220 F.3d at 788. In that case, it is unclear whether the witness received protective services at all, or just a reward and seed money to start a new life away from her husband.

## C. Final Considerations

We leave for future reviewing courts to discern the outer boundaries of what else constitutes the contours of what fits within the phrase "reasonable protective housing." We suggest that "reasonable" protective housing implies that there is some rough correlation between a witness's ordinary living arrangements and those provided to a witness while they are in protective housing. It likely would not have been reasonable, for example, for the State to put Payton in The Plaza Hotel[31] for the entirety of her stay in protective housing. In this case, the State paid less than $14,000 to house Payton (and, presumably, her immediate family) for approximately eight months. Such an expense, in these circumstances, is not unreasonable.

---

[31] The Plaza Hotel is a historic New York luxury hotel on Central Park South in Manhattan, where Payton and her family could have been accommodated, with the same sum of money spent in the present case, for approximately three weeks.

III. CONCLUSION

Payton's experience with the State's protective services is hardly the "financial windfall" that Preston claims it to be. As Detective Moran observed at trial,

> It's a lot for someone to move their life. You know, you got kids. She has a grandmother who was sick in the house. That's her neighborhood. That's her life. And that's a lot to move somebody.

Reasonable protective housing (such as the services provided to Payton) does not constitute a "benefit" within the meaning of Jury Instruction 3:13.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

41