NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11550

COMMONWEALTH  vs.  AMOS DON.


Suffolk.     September 10, 2019. - December 20, 2019.

Present:  Gants, C.J., Lenk, Lowy, Cypher, & Kafker, JJ.


Homicide.  Evidence, Medical record, Cross-examination, Expert
    opinion, Third-party culprit, Prior misconduct.  Practice,
    Criminal, Postconviction relief, Assistance of counsel,
    Capital case.



Indictments found and returned in the Superior Court
Department on March 30, 2010.

The cases were tried before Christine M. McEvoy, J.; a
motion for postconviction relief, filed on April 25, 2017, was
considered by Peter M. Lauriat, J., and a motion for
reconsideration was considered by Christine M. Roach, J.


Chauncey B. Wood for the defendant.
Kathryn E. Leary, Assistant District Attorney (Ian
Polumbaum, Assistant District Attorney, also present) for the
Commonwealth.


KAFKER, J.  On August 25, 2009, Erica Field and Shameek

Garcia were shot in the head at close range as they sat in a

parked vehicle in a lot in the Dorchester section of Boston.

Garcia survived; Field did not. A jury convicted the defendant, Amos Don, of murder in the first degree on the theory of deliberate premeditation, and related charges, in connection with the shootings.[1] Before us is the defendant's consolidated appeal from his convictions, from the denial of his motion for a new trial, and from the denial of a motion to reconsider the denial of his new trial motion. On appeal, the defendant makes three primary claims: (1) that newly discovered medical records warrant a new trial, or at least an evidentiary hearing on the defendant's postconviction motions; (2) that trial counsel was constitutionally ineffective (on several grounds, discussed infra); and (3) that the trial judge committed reversible error in admitting evidence of the defendant's prior, failed attempts to purchase a firearm. For the reasons discussed infra, we reject the defendant's arguments, we affirm his convictions and the denial of his postconviction motions, and we decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Background. 1. Facts. We summarize the facts the jury could have found, reserving certain topics for later discussion. In the summer of 2009, the murder victim, Field, was living in

---

[1] In addition to the conviction for Field's murder, the defendant was convicted of armed assault with intent to murder and aggravated assault and battery by means of a dangerous weapon in connection with Garcia's shooting, as well as unlicensed possession of a firearm.

Lewiston, Maine, with her eleven year old daughter, Monica, and her long-term boyfriend, Garcia, who was also known as "JoJo." In early August of that year, Field and Garcia met the defendant, whom they knew as "Ace," at a house in Lewiston where people would go to buy drugs.

The defendant had traveled to Lewiston from his home in Boston in order to sell cocaine and heroin. Garcia and the defendant began to work together, as Garcia knew the Lewiston illegal drug market and the defendant did not. This was mainly in connection with the defendant's efforts to sell cocaine, as Garcia was less familiar with the market for heroin. Garcia also arranged for the defendant to stay in a spare bedroom in the home of Donald and Deann Dyer in Lewiston in exchange for cocaine. The defendant kept his supply of cocaine and heroin in his bedroom at the Dyers' home.

In early August 2009, the defendant attempted to have a woman named Christine Gilleland purchase three firearms from a gun shop in Poland, Maine. However, her application to purchase the firearms was denied.

About a week before the murder, the defendant discovered that his supply of heroin -- for which he still owed his Boston suppliers about $6,000 -- was missing. The defendant initially blamed Samantha Leonard, a heroin user and a friend of Field and Garcia. Leonard had recently spent time with the defendant in

his bedroom, and when the two were leaving, she had made a point of returning to the room alone to retrieve her cellular telephone. The defendant told Garcia "that if it took him a year or two, he'd put that bitch [Leonard] in a box." The next day the defendant confronted Leonard about the missing heroin, telling her in a "very scary" tone that he "wanted his shit." Leonard told the defendant "he was looking at the wrong person that was sitting there smoking his money," referring to Garcia.[2]

Around this time, the defendant made a second attempt to purchase a firearm, this time from Stephen Waterman. Waterman sold the defendant a .45 caliber semiautomatic with a missing clip. The defendant asked Waterman if he could put a bullet in the chamber without the clip; Waterman said no. Waterman told the defendant that a clip had been ordered and was waiting at a gun shop, but when the defendant went with Deann Dyer to the gun shop to retrieve it, the clip could not be located. The defendant also asked an employee of the gun shop whether a bullet could be loaded in the chamber manually, without a clip; the employee said it could not.

---

[2] Leonard was frightened about what the defendant might do to her, prompting her to tell the police that the defendant had threatened her with a gun. Leonard later admitted that she lied about the defendant having a gun because she wanted the police to take her report of the threats more seriously.

Shortly after that, the defendant and Garcia discussed traveling to Boston so that the defendant could refill his supply of cocaine and try to get an extension to pay his supplier back for the missing heroin. Garcia borrowed a red Ford sedan from an acquaintance in exchange for some cash and cocaine. Because Garcia did not have a valid driver's license, Garcia and the defendant decided that Field should accompany them.

On August 25, 2009, the three drove from Lewiston to Boston in the red Ford sedan. Upon arriving in Boston, they went to the defendant's home. The defendant spent some time on the telephone trying to contact his suppliers. A few hours later, the defendant said he had "found somebody," and they got in the red Ford and began driving to a different location. Garcia drove, with Field in the front passenger seat and the defendant in the rear driver's side seat. The defendant told Garcia where to go, and at some point, they began following a silver sedan. During this time, Garcia gave the defendant the cash that he had brought to spend on the cocaine.

The two vehicles came to a stop in a lot on Norwell Street. The defendant got out of the red vehicle and got into the back seat of the silver vehicle. He stayed in the silver vehicle for a few minutes before returning to the red Ford and getting in the back seat on the driver's side. The last thing Garcia

remembers is turning to his right toward the back seat and asking the defendant if they were "all set."

People in a nearby house heard three gunshots ("pop, pop," then a pause, then "pop") and called the police. Sergeant Detective Sean Doherty responded to a call for shots fired at the lot on Norwell Street. Upon arriving, he observed Garcia standing in the doorway of the front driver's side door of the red Ford. Garcia walked around the front of the vehicle to the front passenger side and dove head first onto Field's lap. Field appeared nonresponsive. Garcia then fell out of the vehicle onto his knees and fell backward onto the ground.

Doherty asked Garcia, "Who shot you?" Garcia said, "Ace." Doherty then asked what Ace's real name was and where he lived. Garcia kept repeating the word, "Ace." His mouth then began to fill with blood. Doherty stopped asking questions at that point because "[he] realized [he] wasn't going to get any different response from [Garcia] and based on his condition, there was no need to go any further."

A review of cellular telephone records, including cell site location information, confirmed that the defendant traveled from Maine to Boston on August 25, and that, once in Boston, he traveled from the neighborhood where he lived to the area of the crime at the time of the murder. Fingerprint analysis of the red Ford showed two of the defendant's fingerprints on the rear

driver's side window.  Ballistics evidence showed that a bullet recovered from Field's body and one recovered from the front passenger's side door of the red Ford were fired from the same firearm.

The medical examiner, Mindy Hull, testified about Field's gunshot wounds.  Wounds to Field's left hand and left nostril could have been caused by a single bullet as Field held her left hand up to her face.  A second bullet entered Field's head behind her left ear, passed through the temporal bone of her skull and through the left side of the cerebellum, bisecting her brain stem (the bullet fragmented during this time), until the major portions of the bullet came to a stop in the right side of the cerebellum.  Hull testified that the wounds to Field's nose and hand showed "stippling," and that the wound behind Field's left ear had "soot deposition," indicating that the firearm was shot within two or three feet of the victim.[3]

Based on a review of medical records, Hull also discussed Garcia's injuries, explaining that Garcia suffered "multiple maxilla facial fractures" to the right side of his face and "traumatic contusion of the right temporal lobe" of his brain. A portion of Garcia's medical records themselves were admitted

---

[3] Hull testified that, with respect to the maximum distance for stippling to occur, she always answers "broadly in the sense of . . . a couple or a few feet," even though "textbooks will say about eighteen inches."

in evidence.  Those records describe his injuries as "Principle Diagnosis: GSW to face," and "GSW to right face."  The records also describe Garcia as having been "shot in the head" with "bullet fragments within the sinus and nasal cavities."

In the days following the murder, the defendant displayed consciousness of guilt through his words and actions.  The defendant's cellular telephone was on his sister-in-law's account.  On August 26, the defendant asked his sister-in-law to change his telephone number, telling her that he was being harassed by his son's mother, Fabiola Ramponeau.  The day after the murder, the defendant visited Ramponeau at work and brought her sneakers for their son that he had bought during the trip down from Lewiston.  He also stayed with Ramponeau twice during the week after the murder.

When Misty Deschaine, a close friend of Field's, called the defendant on the day of the murder to find out what had happened to Field and Garcia, the defendant denied knowing who Field and Garcia were.  Over the subsequent days, Deschaine continued to call the defendant; at one point, she confronted him about the murder, and he stated, "you cannot play with someone else's money . . . or something bad will happen."

Separately, when confronted by Gilleland about whether he had shot Garcia and Field, the defendant responded, "they would have to prove it"; and after Gilleland told him she might be

pregnant with his child, he told her that "[she] didn't want to have a kid with somebody like him cause [she] knew what type of person that he was, and that he could end up doing life in jail" and that "he might have to kill innocent people."

A grand jury indicted the defendant for murder in violation of G. L. c. 265, § 1; aggravated assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15A (b); armed assault with intent to murder, in violation of G. L. c. 265, § 18 (b); and unlicensed possession of a firearm, in violation of G. L. c. 269, § 10 (a). Following a jury trial, the defendant was convicted on all four indictments. As to Field's killing, the jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation. The judge sentenced the defendant to life in prison for the murder and to concurrent sentences of from thirteen to fifteen years for the aggravated assault and battery, from fifteen to twenty years for the armed assault with intent to murder, and from four years to four years and one day for the unlicensed possession of a firearm.

2. Postconviction proceedings. The defendant timely appealed, and postconviction counsel was appointed. On April 27, 2017, the defendant filed a motion for a new trial in this court, which was remanded to the Superior Court. In the motion, the defendant argued that his trial counsel provided

constitutionally ineffective assistance for three main reasons: (1) the failure to utilize evidence that Garcia was an informant to rebut the prosecutor's argument that no one other than the defendant had a motive to shoot Garcia; (2) the failure to challenge the reliability of Garcia's statements to the police immediately after being shot in the head; and (3) the failure to challenge expert testimony presented by the Commonwealth regarding the trajectory of a bullet that became lodged inside the front passenger's side door of the vehicle in which the victims were seated.

After filing the motion, postconviction counsel noticed that one of the Commonwealth's pretrial discovery notices suggested that more medical records existed than those that had been produced to the defendant. Postconviction counsel alerted the Commonwealth, which determined that its file contained the same, underinclusive set of records that had already been produced to the defendant. Postconviction counsel moved for discovery of the additional records. On October 13, 2017, the regional administrative justice ordered production of Garcia's outstanding medical records. Three days later, the case was assigned to another Superior Court judge (motion judge) for resolution of all postconviction motions.

On November 13, 2017, the defendant received notice that the requested records had arrived in the clerk's office. On

November 29, 2017, the motion judge issued a memorandum and order denying the defendant's new trial motion.

On January 25, 2018, postconviction counsel filed a motion for an emergency status hearing and a motion to reconsider the motion judge's decision in light of new evidence. The regional administrative justice indicated that she would deem the motion timely filed and would hear it, because the motion judge had retired.

In a supplemental brief, the defendant argued that "newly discovered" medical records provided material, exculpatory evidence undermining the Commonwealth's theory that the defendant shot the victims from the back seat of the vehicle in which they were seated. The defendant also bolstered his argument that trial counsel had been ineffective in failing to establish that third parties had a motive to shoot Garcia, using evidence gathered through postconviction interviews.

The regional administrative justice considered the additional evidence offered by the defendant and denied the motion to reconsider without granting an evidentiary hearing. The defendant appealed. The defendant's direct appeal was consolidated with the appeals from the denial of his motion for a new trial and his motion for reconsideration. On appeal, the defendant presses all the claims raised in his postconviction motions and further argues that the trial judge committed

reversible error in admitting evidence of the defendant's prior, failed attempts to purchase firearms that could not have been the murder weapon.

Discussion. 1. "Newly discovered" medical records. Prior to trial, the Commonwealth issued a subpoena to Boston Medical Center (BMC) for "all medical records for Shameek Garcia." In a certification dated November 16, 2009, BMC indicated that it was producing over 1,000 pages of records in response to the subpoena. The Commonwealth in turn produced a set of Garcia's medical records to the defendant in pretrial discovery. At the time of trial, neither defense counsel nor the prosecution noticed any discrepancy between the number of pages produced and the number of pages indicated in the certification. Upon reviewing these same materials after trial, postconviction counsel noticed that the defendant's trial file contained only about 600 pages of medical records from BMC, rather than the over 1,000 pages indicated on the certification. Postconviction counsel alerted the Commonwealth, which determined that it had the same, underinclusive set of records possessed by the defendant. With court permission, postconviction counsel made a new request for discovery from BMC. This time, BMC produced over 2,000 pages of records.

The defendant argues that the medical records obtained by postconviction counsel constitute "newly discovered" evidence

warranting a new trial under the standard set forth in Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986). We disagree. In order to constitute "newly discovered" evidence under Grace, the records must have been "unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial." Id. at 306. This requirement is not satisfied where postconviction counsel was alerted to the missing records by reviewing the same set of documents that was available to trial counsel. However, as the defendant suggests, this merely begs the question whether trial counsel was ineffective for failing to obtain the additional records. We turn to that question next.[4]

2. Ineffective assistance of counsel. Where a defendant has been convicted of murder in the first degree, "we review for a substantial likelihood of a miscarriage of justice by asking whether there was error and, if so, whether the error was likely to have influenced the jury's conclusion" (quotations and

---

[4] In any event, for the same reasons discussed infra that we conclude that this oversight by trial counsel did not create a substantial likelihood of a miscarriage of justice, we also conclude that, even if the evidence were deemed "newly discovered," the defendant would be unable to satisfy Grace's additional requirement that the evidence "cast[] real doubt on the justice of the conviction." Grace, 397 Mass. at 305. In so doing, we do not consider whether Grace's second prong is more or less favorable to a defendant than the "substantial likelihood of a miscarriage of justice" standard under G. L. c. 278, § 33E. We merely conclude that on these facts, neither standard is satisfied.

citation omitted). Commonwealth v. Barnett, 482 Mass. 632, 638 (2019). See Commonwealth v. Ayala, 481 Mass. 46, 62 (2018); Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014). We apply this standard "even if the action by trial counsel does not constitute conduct 'falling measurably below that . . . of an ordinary fallible lawyer.'" Commonwealth v. Gonzalez, 443 Mass. 799, 808-809 (2005), quoting Commonwealth v. MacKenzie, 413 Mass. 498, 517 (1992). This standard is more favorable to a defendant than the constitutional standard for ineffective assistance of counsel under Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). See Ayala, supra. In conducting this review, we "accord tactical decisions of trial counsel due deference" (quotation and citation omitted). Commonwealth v. Evans, 439 Mass. 184, 195, cert. denied, 540 U.S. 923 and 540 U.S. 973 (2003). "Unless such a decision was manifestly unreasonable when made, we will not find ineffectiveness" (quotation and citation omitted). Id at 195-196.

Here, the defendant's claims of ineffective assistance center around the fact that trial counsel did not cross-examine the Commonwealth's primary expert witnesses, nor did he offer any expert testimony on behalf of the defense. In his affidavit in support of the defendant's motion for a new trial, trial

counsel stated that he "believed that the forensic evidence was not helpful to the defense so [he] tried to stay away from it."

Consistent with the standard just described, we do not dwell on whether in making this decision, trial counsel's performance "[fell] measurably below that . . . of an ordinary fallible lawyer" (citation omitted).  Gonzalez, 443 Mass. at 809.  Rather, for the reasons discussed infra, we conclude that, in the circumstances presented here, any error in failing to challenge the Commonwealth's expert evidence did not create a substantial likelihood of a miscarriage of justice.  We address each of the defendant's individual claims of ineffective assistance of counsel in turn.

a.  Failure to obtain Garcia's complete medical records or to present expert testimony that Garcia was shot in the interior of the mouth.  In arguing that reversal is warranted based on the failure to obtain Garcia's complete medical records, the defendant primarily relies on the fact that certain radiology reports were omitted from the set of records produced prior to trial, which would have supported expert testimony that Garcia was shot in the interior of the mouth, not the back of the head or the side of the face.  In support of this argument, the defendant submitted the affidavit of Edward T. McDonough, III, stating that, based on the radiology reports and other records, Garcia "suffered a gunshot wound to the head, specifically,

entering through the mouth."  McDonough further opined that "[a]ssuming [Garcia] was sitting normally in the driver's seat, facing forward," it would be "extremely difficult" for a shooter sitting "directly behind" the driver to have caused the injuries observed.  This proffered testimony, the defendant maintains, "disproves" the Commonwealth's theory of the case and warrants a new trial, or at least an evidentiary hearing on the defendant's motion for a new trial.

After a thorough review of the medical records available at trial and those produced posttrial, we are not persuaded. First, the upshot of the information contained in the radiology reports produced posttrial -- indicating that Garcia was shot in the interior of the mouth -- was also present in the records that were available to defense counsel at the time of trial.[5] Second, and perhaps more importantly, it was not essential to the Commonwealth's theory of the case that the defendant be seated "directly behind" Garcia, with Garcia "facing forward," when the shooting occurred.  Testimony at trial indicated that

---

[5] Many of the records refer to the fact that Garcia was shot "in," "to," or "through" the "mouth."  One record states that the gunshot wound was "to face . . . entry in mouth . . . no exit wound"; another notes that Garcia had blood coming from the mouth and nose with "no visible entry/exit wound"; and a third notes a possible "self-inflicted gunshot wound mouth [sic]." Once again, this merely begs the question whether trial counsel was ineffective for not consulting an expert based on the records available to him prior to trial.

the defendant sat in the seat behind the driver's seat on the way to the lot where the shooting occurred, that he got out of the vehicle for a period of time, and that he reentered the vehicle through the rear driver's side door immediately prior to the shooting.

The jury could reasonably have inferred that someone entering the back seat of the vehicle with the intention of shooting the two people seated in the front seats would position himself in the center of the back seat, directly behind the gap between the two seats. Photographs admitted in evidence support that such positioning was both reasonable and possible.[6] See Evans, 439 Mass. at 200, citing Commonwealth v. Marquetty, 416 Mass. 445, 452 (1993) ("An inference need not be inescapable, just reasonable and possible"). Such positioning is consistent with Garcia's testimony that he turned to his right, toward the back of the vehicle, before he was shot, and it is consistent with McDonough's opinion that when Garcia was shot, the bullet entered his mouth and "fragment[ed] inside his right facial area." Such positioning is also consistent with evidence that

---

[6] More specifically, one exhibit shows the back seat of the red Ford as viewed through the open rear driver's side door. Although a shopping bag, toys, and other debris fill the seat directly behind the front passenger seat in which Field was seated, the photograph shows that no debris was blocking someone from sliding from the rear driver's side seat into the center of the rear seat, directly behind the gap between the two front seats.

Field was shot in her left hand and nostril and behind her left ear.

Thus, McDonough's proffered testimony that "[a]ssuming [Garcia] was sitting normally in the driver's seat, facing forward," it would be "extremely difficult" for a shooter sitting "directly behind" the driver to have caused Garcia's injuries would have done little to undermine the Commonwealth's ultimate theory of the case.[7]  Moreover, the circumstantial evidence against the defendant in this case was overwhelming. Cellular telephone records placed the defendant at the scene of the crime; he had a strong motive for killing Garcia and Field (to repay his suppliers and ensure that someone other than he suffered the consequences for the missing heroin); and his statements and actions following the murder displayed consciousness of guilt.  The strength of this evidence, viewed in conjunction with the limitations of McDonough's proffered testimony, discussed supra, lead us to conclude that the proffered testimony would have been unlikely to have changed the jury's conclusion.

---

[7] Similarly, the proffered expert testimony of a ballistics expert, discussed infra, identifying another possible, but "less likely" possibility -- that the shooter was positioned outside the vehicle -- would have been unlikely to have influenced the jury's decision.

In sum, there was no substantial likelihood of a miscarriage of justice arising from trial counsel's failure to procure largely redundant medical records, or to present expert testimony "disproving" a particular factual scenario that was not essential to the Commonwealth's theory of the case.  See Commonwealth v. Morgan, 449 Mass. 343, 358 (2007) (no substantial likelihood of miscarriage of justice arising from failure to cross-examine Commonwealth's expert or to call defense expert where defense expert's testimony "likely would not have influenced the jury's ultimate conclusion").  See also Commonwealth v. DiBenedetto, 475 Mass. 429, 439-441 (2016) (factual basis for defendant's claim that particular evidence was "powerfully exculpatory" not borne out by trial record).

b.  Failure to consult an expert to challenge Garcia's ability to respond to police questions.  The defendant next claims that trial counsel was ineffective for failure to consult an expert to challenge the inference that Garcia's utterance of the word "Ace" after being asked "Who shot you?" constituted a "reliable answer" to that question.  In support of his motion for a new trial, the defendant submitted the affidavit of a neurologist, Ryan Darby, who opined that the head injuries Garcia suffered "affect decision-making ability" and that "answering a question reliably is a form of decision-making." Based on Doherty's testimony that Garcia was not responding

appropriately to many of his questions, Darby would have testified that "it is not clear that [Garcia] was responding at all to Sergeant Doherty's first question, 'Who shot you?'" Darby would have further opined that "[i]t is possible that as a result of perseveration, [Garcia] was simply repeating the last word he had spoken prior to being shot and that the statement 'Ace' had no causal connection to Sergeant Doherty's question."

The Commonwealth argues that this testimony would have been inadmissible, as it would have invaded the province of the jury to assess credibility. Even assuming its admissibility (an issue that we do not decide), we conclude that the proffered testimony would have been unlikely to influence the jury's ultimate conclusion, given that it would have only incrementally advanced a defense theory that was already before the jury, and given the strength of the circumstantial evidence against the defendant.[8]

The jury were already presented with testimony about Garcia's inability to answer Doherty's questions appropriately and with evidence that Garcia had suffered severe injuries to his brain. This testimony enabled defense counsel to argue in closing:

---

[8] Similarly, trial counsel's failure to introduce evidence that a police report described Garcia as "mumbling incoherently" is unlikely to have altered the jury's conclusion.

>       "[The word 'Ace' is] an answer correctly to one question
>       only.  So there is the possibility based on the testimony
>       of Sergeant Doherty and based on your review of the medical
>       records of Mr. Garcia that you will see and based up[on]
>       his testimony and your observations of him that he just
>       couldn't remember, just couldn't remember. . . .  So when
>       Mr. Garcia answered the word 'Ace' to Sergeant Doherty, he
>       really I suggest most respectfully when you look at
>       everything you can't rely on what the answer was that Mr.
>       Garcia [gave] to that particular series of questions, the
>       same one, at that particular time especially now based on
>       the testimony of Mr. Garcia that he cannot remember
>       anything that happened after Ace got back into the car on
>       August 25, 2009."[9]

While the proffered expert testimony could have strengthened this argument incrementally, by providing a medical explanation for why "Ace" was not an answer to the question "Who shot you?," such testimony ultimately would have been unable to draw the sting out of the fact that the defendant's name was the word Garcia repeated over and over again moments after he was shot. In particular, it would not have diminished (and indeed, it might have increased, through the introduction of the concept of perseveration) the likelihood that the jury would infer that Garcia was repeating the word "Ace" because the last thing he saw before he was shot was the defendant pointing a gun in his

---

[9] On appeal, the defendant makes much of the fact that trial counsel "conceded" that Garcia "correctly" answered Doherty's first question.  We think it clear that trial counsel did not concede this point but was instead urging the jury not to rely on that statement.  In context, the word "correctly" only meant that the answer could have been considered responsive to the question.  The answer could not even have been considered responsive to the other questions asked by the officer.

face.  Adding to that the other strong circumstantial evidence against the defendant, discussed supra, we conclude that trial counsel's failure to call a neurological expert did not create a substantial likelihood of a miscarriage of justice.  See Morgan, 449 Mass. at 358.

c.  Failure to challenge the Commonwealth's ballistics evidence.  The defendant also argues that his trial counsel was ineffective for failing to challenge the Commonwealth's ballistics evidence, either through cross-examination or through countervailing expert testimony.  The Commonwealth's expert, Kevin Kosiorek, testified that the bullet recovered from the passenger door was traveling at a diagonal angle from the rear of the vehicle to the front.  Kosiorek qualified this testimony with the observation that his conclusion was approximate, with an error rate "usually a plus or minus of [five] degrees." Kosiorek also acknowledged that he was unable to say "one way or another" whether the bullet might have been deflected before it struck the door, and he could not say what the "original path" of the bullet might have been.

The defendant argues that trial counsel should have consulted an expert, who could have offered trajectory evidence to undermine an inference that the shots were fired from the back seat of the vehicle.  More specifically, in support of his motion for a new trial, the defendant submitted the affidavit of

Gregory A. Danas, who stated that "[i]n [his] opinion, it is reasonably possible that the shots fired in this case originated from someone standing outside the car.  It is also reasonably possible that the shots were fired from two different shooters." As to Kosiorek's analysis, Danas merely pointed out the same shortcomings that Kosiorek had already acknowledged ("[I]t is my opinion that [Kosiorek's] conclusion at trial about trajectory, is, as he stated, only an approximation.  It is virtually impossible to determine the actual true trajectory of the recovered bullet in this case, given the known obstructions and unknown changes in [Field's] body position.").  Danas added that, given that uncertainty, "there is a reasonable possibility that the bullet shot toward [Field] and coming to rest inside the door frame was fired from a firearm whose muzzle was located at, or partially within, the threshold of the rear driver-side window.  While less likely, it is also possible that [Field] was shot by someone standing immediately outside the front driver-side window."[10]

---

[10] Danas also suggested that gunpowder residue testing could have established with more certainty whether the bullets were fired from inside or outside the vehicle, but it is mere speculation what the results of such testing would have been. And in any event, Danas did not address the evidence of stippling and soot deposition on Field's wounds, which suggested the bullets that injured her were fired at short range.

For reasons similar to those discussed supra with respect to McDonough's proffered testimony, we are of the view that such testimony would have been unlikely to alter the jury's ultimate conclusion.  Merely offering the possibility of another scenario, based on an incomplete accounting of the evidence, is insufficient to meet the defendant's burden to show that the proffered evidence "was likely to have influenced the jury's conclusion" (citation omitted).  Barnett, 482 Mass. at 638, 640 (holding that in face of strong circumstantial evidence against defendant, defense counsel's failure to engage in "battle of the experts" over certain marginally relevant DNA evidence "would not have been so significant as to influence the jury's verdicts").  Contrast Commonwealth v. Hill, 432 Mass. 704, 719 (2000) ("Evidence that contradicted the Commonwealth's entire theory of the case could have raised a reasonable doubt in the jurors' minds").  There was no substantial likelihood of a miscarriage of justice.

d.  Failure to utilize evidence that Garcia was an informant, or to conduct further investigation, in support a third-party culprit defense.  The defendant argues that his trial counsel was constitutionally ineffective for failing to utilize evidence that Garcia was an informant for the Federal Drug Enforcement Administration (DEA), or to develop further

evidence through witness interviews, in support of a third-party culprit defense.

Before trial, the prosecutor disclosed materials to defense counsel revealing Garcia's status as a paid DEA informant. The materials were under a protective order, and defense counsel did not move to lift the protective order prior to trial. During a hearing on motions in limine, upon a request by the prosecutor, the trial judge instructed that defense counsel should consult with him at sidebar in the event defense counsel wanted to admit any evidence of Garcia's status as an informant. Defense counsel agreed. However, the topic was not brought up during trial. In addition, before trial, defense counsel received other discovery from the Commonwealth, arguably suggesting a potential third-party culprit defense.[11] Admittedly, trial

---

[11] James Lee, a Lewiston resident familiar with Garcia, testified at the grand jury that he was worried about Garcia days before the shooting and that Garcia had said he (Garcia) "had to go out of town" and would not be coming back. A second individual, Jalissa Garcia, also stated to police that Amber Dyer, another Maine resident, had called Garcia's family in Florida days after the shooting looking for Garcia, stating that Garcia had told her he was moving to Florida and could be reached there. A third individual, Rodney Jackson, said to police that he heard "on the streets" that three young people with ties to the Four Corners or Algonquin areas in Maine had shot Garcia and Field. A fourth individual, Jenna Labbe, stated to police that Nick Coy, another Maine resident, had claimed to her that "one of his boys" had shot the victims. However, Labbe also stated that she did not believe Coy had been telling the truth because "he is just a little punk."

counsel did not follow up on this information or interview any of these individuals.  However, for the reasons discussed infra, we conclude that the failure to further develop a more specific third-party culprit defense did not create a substantial likelihood of a miscarriage of justice.[12]

In support of his motion for reconsideration, the defendant submitted the affidavit of Jason Angus, detailing an investigation performed at the behest of postconviction counsel. More specifically, Angus spoke with Rodney Jackson, James Lee, and Christine Gilleland.  Jackson and Gilleland said that Garcia had a reputation for short-changing his suppliers.  Lee, Jackson, and Gilleland also told the investigator that Garcia had a specific reputation for being a suspected informant.  They also said that it was common knowledge in the Lewiston drug community that Garcia planned to drive down to Boston on August 25, 2009.

We agree with the motion judge that this evidence falls short of meeting the defendant's burden on a motion for a new trial to establish that justice has not been done, or to raise a substantial issue necessitating an evidentiary hearing.

---

[12] In closing, defense counsel suggested that the shooter may have come from the silver sedan, raising the possibility that the shooting was the product of a drug deal gone bad.

Evidence that a third-party culprit committed the crime is admissible "if the judge determine[s] that it ha[s] 'a rational tendency to prove the issue the defense raises' and [it is] not 'too remote or speculative.'"  Commonwealth v. Alcide, 472 Mass. 150, 161 (2015), quoting Commonwealth v. Silva-Santiago, 453 Mass. 782, 801 (2009).  See Commonwealth v. Holliday, 450 Mass. 794, 807-811, cert. denied sub nom. Mooltrey v. Massachusetts, 555 U.S. 947 (2008); Commonwealth v. Murphy, 442 Mass. 485, 507 (2004); Mass. G. Evid. § 1105 (2019).  To that end, a defendant must demonstrate that the acts of another person are "so closely connected in point of time and method of operation as to cast doubt upon the identification of [the] defendant as the person who committed the crime" (citation omitted).  Commonwealth v. Buckman, 461 Mass. 24, 31 (2011), cert. denied, 567 U.S. 920 (2012).  See Commonwealth v. Conkey, 443 Mass. 60, 66 (2004), S.C., 452 Mass. 1022 (2008).

Here, we agree with the Commonwealth that the proffered evidence fails to meet the standard for admissibility of third-party culprit evidence.  Rather, the investigation performed at the behest of postconviction counsel failed to turn up any specific individual with more than a generalized motive to harm Garcia, and it did not connect any other specific individual to the scene of the crime.  See Buckman, 461 Mass. at 31 (proffered evidence of tension with neighbor was inadmissible where "the

defendant offered and produced no evidence suggesting that the neighbor had any opportunity to kill beyond that possessed by any neighbor"); id. (proffered evidence that serial killer was "on the loose" in area was inadmissible where defendant "could not place the serial killer in the vicinity at the time of this murder").

For similar reasons, even if the evidence were admissible, we would conclude that it was not likely to have affected the jury's decision to convict. Here, Garcia had no memory of the shooting itself, and the evidence supported an inference that there was at least one other person (in addition to the defendant and the two victims) at the scene of the crime, namely, the driver of the silver sedan. As noted supra, based on this evidence, trial counsel was able to argue in closing that the defendant's supplier or "the supplier's muscle" could have been in the silver sedan and could have shot Garcia "to punish somebody for violating the cardinal rule of drug dealing. Do not steal from the supplier." The addition to this of further, cumulative evidence of unidentified third parties with a generalized motive to harm the defendant would have been unlikely to sway the jury. See Breese v. Commonwealth, 415 Mass. 249, 252-253 (1993) (counsel's alleged failure to investigate another suspect was not ineffective where defendant failed to show that "better work might have accomplished

something material for the defense" [citation omitted]).  Under
these circumstances, the failure of trial counsel to further
develop a third-party culprit defense did not create a
substantial likelihood of a miscarriage of justice.

3.  Admission of evidence of the defendant's prior attempts
to purchase a firearm.  Finally, the defendant contends that the
trial judge committed reversible error by admitting evidence of
the defendant's prior attempts to obtain firearms other than the
murder weapon.  The defendant preserved this issue by opposing
the Commonwealth's motion in limine to introduce the evidence
and by objecting when the testimony was introduced at trial.  We
therefore review the issue for prejudicial error.

Evidence of prior bad acts is generally inadmissible to
show a defendant's propensity to commit a crime.  See
Commonwealth v. Vasquez, 478 Mass. 443, 448 (2017); Mass. G.
Evid. § 404(b)(1).  However, such evidence may be admitted if
relevant for some other purpose, provided that its probative
value outweighs the risk of unfair prejudice to the defendant.
See Vasquez, supra; Commonwealth v. Bonnett, 472 Mass. 827, 840-
841 (2015); Commonwealth v. McGee, 467 Mass. 141, 157 (2014);
Commonwealth v. Ridge, 455 Mass. 307, 322-323 (2009); Mass. G.
Evid. § 404(b)(2).

Where the proffered evidence concerns a weapon that
"definitively could not have been used in the commission of the

crime, we have generally cautioned against admission of evidence related to it," Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012), recognizing that the "tenuous relevancy" of such evidence rarely outweighs the risk of unfair prejudice to the defendant, Commonwealth v. Toro, 395 Mass. 354, 358 (1985).  See McGee, 467 Mass. at 157; Barbosa, supra.  In cases where we have approved of the admission of such evidence, we have often required a limiting instruction "to ensure that its probative value outweighs the danger of unfair prejudice."  McGee, supra at 158, citing Ridge, 455 Mass. at 323, and Holliday, 450 Mass. at 816.

Here, the judge allowed the Commonwealth's motion in limine to admit the evidence for the limited purposes of putting the defendant's actions into context -- e.g., by demonstrating the defendant's motive for waiting until the trip to Boston to carry out the shootings, as he had not previously acquired a firearm and sought one -- and showing the defendant's familiarity with firearms.  These were permissible purposes for admitting the evidence, provided that the probative value of the evidence outweighed the danger of unfair prejudice.  See Ridge, 455 Mass. at 322 (demonstrating "access to" and "familiarity with" firearms is permissible purpose); Mass. G. Evid. § 404(b)(2) (demonstrating "motive" or "intent" is permissible purpose).

When ruling on the motion in limine, the judge stated that she would give a limiting instruction when the evidence was admitted, but when the time came, she apparently did not do so.[13] However, she did give a limiting instruction in her final charge.[14]  Although the better practice would have been to give a

---

[13] The judge had given a general instruction on propensity evidence during the testimony of a prior witness, without specifically mentioning firearm evidence, in which she stated:

> "Jurors, before I release you for the morning recess, I do want to give you an instruction.  You heard a number of references through this witness in regard to drug activity as it pertains to the witness as well as to the defendant.

> "That evidence is admitted for certain limited purposes in this case, including to put into context the allegations that are presently before the Court.  They are not -- it is not being admitted to show any criminal propensity or bad character of the defendant or that he would be more likely to have committed the crimes that are before the Court."

The judge's remarks during the final charge conference indicate that she thought that her prior instruction specifically mentioned firearm evidence ("I will give at the defendant's request a further instruction in regard to the limited use of certain evidence that was presented, specifically . . . seeking a firearm . . ."), something she also expressed in her final charge to the jury, see note 14, infra.

[14] The judge instructed the jury as follows:

> "A further evidentiary matter, I want to remind you of as well is this.  That the defendant is not charged with committing any crimes other than those contained in the four indictments before the Court.  You have heard mention of other acts allegedly done by the defendant, specifically I gave you limiting instructions at the time in regard to evidence as it pertained to dealing in narcotics or dealing drugs, if you will, or seeking -- you heard evidence that he was seeking to obtain a firearm, and you also heard

more specific contemporaneous limiting instruction in addition to a specific limiting instruction in the final charge, in this case, we conclude that the general instruction on propensity evidence given prior to the admission of the evidence, in conjunction with the specific limiting instruction in the final charge, provided sufficient guidance to the jury about the limited purposes for which the evidence was admitted.  Contrast McGee, 467 Mass. at 157-158 (danger of unfair prejudice from photograph of defendant holding silver gun that could not have been murder weapon outweighed probative value where judge's final charge "did not instruct the jury adequately as to the proper use of the evidence").

Moreover, even if we were to conclude that the evidence was improperly admitted, we would conclude that the error was

---

evidence in regard to alleged threats.  Again, these are allegations, but they were admitted for limited purposes, and those limited purposes relate to the government's theories in the case, particularly with regard to motive, circumstances surrounding the interaction between certain individuals and to put certain conduct into context.

"You may not consider any of those acts referred to now generally, but I believe I instructed you more specifically, as proof that defendant had criminal propensity or bad character, or that he committed the crimes before this Court.  So for example, even if you were to determine that the defendant dealt in drugs, that does not mean he is guilty of the indictments before the Court. They are part of the evidence.  You can give them what weight you feel they are fairly entitled to receive but only in accordance with my instruction and for the limited purpose for which they are offered."

harmless due to the "scant attention" given to the evidence at trial, McGee, 467 Mass. at 158, citing Barbosa, 463 Mass. at 124, and the strength of the other evidence against the defendant, discussed supra.

4.  Review pursuant to G. L. c. 278, § 33E.  Finally, after a thorough review of the record, we discern no reason to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to reduce or set aside the jury's verdict of murder in the first degree.

Conclusion.  For the foregoing reasons, we affirm the defendant's convictions and the denial of the defendant's postconviction motions.

So ordered.